[No. 13362. Department One. November 10, 1916.]

Louis J. Haas et al., *Appellants*, v. Washington Water Power Company, *Respondent.*[1]

APPEAL—REVIEW—THEORY OF TRIAL—OBJECTIONS BELOW. Where the answer was treated at the trial as denying the allegation of negligence in a certain paragraph, it cannot be claimed for the first time on appeal that the same had been admitted by failing to deny such paragraph.

DISCOVERY — INTERROGATORIES — REFUSAL TO ANSWER—PENALTY— STATUTES—HARMLESS ERROR. Under Rem 1915 Code, § 1230, providing for the striking of the offending party's pleading for refusing to answer interrogatories and the rendition of judgment against him, it is not error to deny a motion for judgment at the trial for such refusal, where the moving party did not bring himself within the statute by moving to strike the pleading and the offending party was required to file an answer to the interrogatory before any evidence was introduced, and the failure to answer it earlier had no prejudicial effect.

ELECTRICITY—ACTION FOR INJURIES—ELECTRIC SHOCK—PROXIMATE CAUSE—QUESTION FOR JURY. In an action for injuries sustained through an electric shock, shortly after a stroke of lightning had broken defendant's high voltage transmission wires, whether the injury was caused by the act of the defendant in again charging the wires shortly after the shock, is for the jury, where experts expressed the view that a wet cross arm, upon which the broken wire rested, was a sufficient conductor to carry the excessive charge over the distribution wires to plaintiff's house and cause plaintiff's injury, although the same was disputed and there was vague evidence of a second stroke of lightning.

SAME—ACTION FOR INJURIES — ELECTRIC SHOCK — NEGLIGENCE— QUESTION FOR JURY. In an action for injuries through receiving an electric shock, after a break in the defendant's high voltage line, when defendant again turned on the current to test out the line, the negligence of the defendant is a question for the jury, where all the experts testified that the only practicable method of locating the trouble was to turn on about one-half of the normal voltage, and defendant's witness in charge of the power house, who was the only person who could testify on the subject, contradicted himself, first testifying that he turned on the full voltage and repeated it on cross-examination, but finally reduced it to less than half the

[1]Reported in 160 Pac. 954.

normal voltage; especially where the defendant's answer to an interrogatory showed that the line was charged with normal voltage.

SAME—ACTION FOR DAMAGES—NEGLIGENT CONSTRUCTION—EVIDENCE —STATUTES. Compliance with Rem. 1915 Code, § 4976-1, prescribing certain rules for the construction of electrical lines, is not evidence of proper construction except in the particulars covered by the statute; and does not cover the necessity of using lightning arresters over transformers on poles carrying high voltage wires so as to prevent excessive current entering premises on distribution lines in case of a stroke of lightning.

Appeal from a judgment of the superior court for Spokane county, Huneke, J., entered July 16, 1915, in favor of the defendant, notwithstanding the verdict of a jury rendered in favor of the plaintiffs, in an action for personal injuries sustained through contact with an electric current. Reversed.

*Robertson & Miller* and *Rosenhaupt & Grant*, for appellants.

*Post, Russell, Carey & Higgins*, for respondent.

ELLIS, J.—Action for personal injuries. Defendant operates an extensive electric power system in eastern Washington and southern Idaho. It has a number of generating plants. One of these, a water power plant, is located on the Spokane river at Post Falls, Idaho. These generating plants are all tied into one system by means of high power transmission lines which are controlled from a substation in the city of Spokane, known as the Twenty-ninth avenue substation. The Post Falls plant is connected with the general system by two high tension transmission lines running by different routes from Post Falls to the Twenty-ninth avenue substation. One of these lines passes through Otis Orchards, a community about sixteen miles easterly from Spokane. This line normally carries from 60,000 to 64,000 volts. It consists of three wires. The poles carrying these wires in the vicinity of Otis Orchards are set along the south side of a highway known as the Trent road, which runs in an easterly and westerly direction. One of the high tension wires

is strung on the extreme top of the poles, the other two near either end of a cross arm attached to the pole a few feet below the top. These wires are at regular intervals transposed so that what is the top wire at one point is the north or south cross arm wire at another point. These high tension wires are uninsulated large aluminum wires, and are protected from contact with the poles and cross arms by large insulators at the points where they are strung.

This pole line also carries another power line running from Post Falls to a point some distance west of Otis Orchards but not as far as Spokane. This second line also consists of three wires which normally carry approximately 6,900 volts. These wires are strung on a second cross arm about five feet below the cross arm carrying the two high tension wires. The 6,900 volt wires constitute a distribution line, that is, they carry power intended for distribution to consumers along the route, among them the consumers at Otis Orchards. Two of these distribution wires are attached to that part of the cross arm extending southerly from the pole. The third is attached to the opposite or northerly end of the cross arm. The service wires, which must not be confused with the distribution wires, lead from the distribution wires on the poles to the premises of each individual consumer. Normally there is no connection between the high tension 60,000 volt line and the 6,900 volt distribution line. The high tension line is used exclusively to transmit current from the Post Falls plant to the Twenty-ninth avenue substation. All the power used by consumers along the route is transmitted over the 6,900 volt distribution line. The power is delivered to each individual consumer from this line through a transformer placed on the pole in front of his premises immediately beneath the cross arm carrying the distribution wires. By the transformer, the current of 6,900 volts is stepped down to 110 or 220 volts before it is passed onto the service wires. The side of the transformer into which the 6,900 volt current is received from the distribution wires is

called the primary side and the other the secondary side. On each side of the transformer is a fuse box containing the fuse, which is a section of wire made of lead or other soft metal which will melt in case of an excessive charge of electricity, thus automatically severing the connection between the primary side of the transformer and the distribution wire, the fuse box on the other side being intended to perform the same office of severing the connection between the transformer and the service wire, in case an excessive current should find its way through the transformer.

On the pole immediately in front of the plaintiffs' house, there were two ground wires. One of these extended from the secondary side of the transformer down the pole into the ground. The other extended from the ground to the top of the pole and had branches extending horizontally along the upper side of the uppermost cross arm, that is, the cross arm carrying the two 60,000 volt wires. The function of the first is to conduct into the ground any excess current that might pass through the transformer to the secondary side, that of the second to ground any current that might escape from the high tension wires.

Plaintiffs live at Otis Orchards on the south side of the highway and receive power from the defendant with which to light their dwelling. On plaintiffs' premises are located two dwellings. The larger is occupied by plaintiffs and their family, the smaller by the family of plaintiffs' married son. The two buildings are about eighteen or twenty feet apart. Both are furnished with light by the same service wires which pass from the transformer to plaintiffs' dwelling and thence to that of their son. There was evidence indicating that only the two distribution wires strung on the south end of the lower cross arm entered the transformer and furnished the power for the lighting of these two buildings, and that the wire strung on the end of the lower cross arm north of the pole had no connection with the transformer.

Between eleven o'clock a. m. and noon on June 27, 1914, there was a severe electrical storm accompanied with rain and hail in the vicinity of Otis Orchards. Lightning struck defendant's high tension transmission line a short distance to the west of the pole immediately in front of plaintiffs' premises. Some of the witnesses testified that they saw a ball of flame or fire traveling along the upper wire until it reached this pole, when it passed down the pole to the ground. Afterwards it was discovered that the insulator on the top of this pole was shattered and the top wire which it bore was thrown down so that it lay across the top cross arm about two feet from the pole. This same wire (which about one-half a mile to the west of the plaintiffs' residence was transposed to the north end of the cross arm so that at that point it was the north transmission wire), was broken a little less than two feet from the cross arm of the pole at that point, that end of the broken wire projecting into the air. The other end had fallen to the ground and was hanging from the cross-arm of the next pole to the west, the end lying on the ground a little to the north of the pole line and passing about eight inches or a foot north of the north distribution wire on the lower cross arm. The fuse box on the primary side of the transformer on the pole in front of plaintiffs' premises was shattered by the lightning and the fuse melted. The transformer was subsequently tested and found to be in perfect working condition.

At the time of the storm, plaintiff Wilhelmina Haas and her daughter were at work in the kitchen of plaintiffs' house. They were on either side of a table over the middle of which was suspended from the ceiling an electric light. It seems to be conceded that a charge of lightning entered the house and shocked the daughter, throwing her to the floor and rendering her unconscious for a short time. When she recovered consciousness, she discovered fire in the basement of her brother's house. She and her mother at once went into the other house and extinguished the fire. When the fire was

discovered, plaintiffs' daughter-in-law started towards a club-house about a quarter of a mile to the west where her husband was employed, to give an alarm. Plaintiffs' son and several fellow workmen, together with others, hastened to the scene of the fire, but by the time they reached it the fire had been extinguished. Immediately after the fire, it was found that the electric light wires in the basement were disarranged and burned off and that the electric light bulb was demolished. The burned wires were the wires of a switch which was placed on the door jamb of the cellar door. The ends of these switch wires were either hanging in the door or a short distance within the cellar. When the men came from the club house and its vicinity, plaintiff Mrs. Haas and a young man named Morgenthaler, with several of the men, went into the base-ment to see that the fire was wholly out. Some of the men had passed out, but Mrs. Haas, Morgenthaler and another man were in the act of passing out when Mrs. Haas, in pass-ing under one of the wires which had been burned off, received a shock which severely burned her about the face, head and soles of her feet. At the same time Morgenthaler, who was standing about four feet from the wire but was uncertain whether he was touching Mrs. Haas or not, received a shock which threw him to the cellar floor and rendered him uncon-scious for a short time. One of the witnesses testified that, hearing the flash, he looked in the direction of Mrs. Haas and saw a flame passing from the ends of the wires directly into her face. From the evidence, it seems to be fairly estab-lished that this occurred about ten or fifteen minutes after the defendant's power line was struck by lightning and after the shock received by plaintiffs' daughter in the other house.

It appears that the switchboard in defendant's substation at Twenty-ninth avenue in Spokane is equipped with oil switches so arranged that in case of any interruption of the circuit on the transmission wires the switch will be thrown, thus automatically disconnecting the transmission line and shutting off the current. In the power house at Post Falls

it does not appear that there were any of these automatic oil switches, but it does appear that an interruption or trouble on the line was detectable by a noise in the machine. It was shown from the records kept at the substation in Spokane that the oil switch tripped out on the 27th day of June, 1914, at 11:37 a. m. The Post Falls station operator testified that, at 11:37 a. m., he detected trouble on the high power transmission line through the noise in the machine. His testimony was as follows:

"Q. Now, to get it down into language that we can all understand, tell me what this means; what did you do? A. When the trouble came on? Q. Yes; first, when did you observe any trouble on the high power transmission line? A. Why, I noticed that on the machines. Q. When was it? A. At the time stated, and I opened the switch. Q. When was that? A. 11:37 a. m. Q. That is when the trouble was shown on the high power transmission line? A. Yes, sir. Q. What happened then? What happened to the switch? A. How do you mean? Q. Well, was it closed or open or did anything else happen to it? A. Well, it was closed, and I opened it. Q. Now, opening the switch, what does that mean? A. Well, that breaks the circuit. Q. The circuit is broken? A. Yes, sir. Q. What had you observed before the switch was opened at 11:37? A. The noise in the machine; that was the first time there was trouble on the line. Then I could hear the spring of the meters, and saw there was trouble on that line, so I opened that line immediately. Q. And then what did you do? A. I reported to the system operator. Q. What did you do with that line after that? A. After I opened it? Q. Yes, after you opened it? A. I reported it to the system operator, that there was trouble on it, and waited for orders. Q. Then what did you do at Post Falls; that is what I want to know? A. Well, I changed over the generators so I could get one generator on one bus, and get ready to try it out, and when I got orders to try it out I cut her in on the generator at half voltage. Q. Half voltage? A. Between sixty and seventy; it was about 120 on our machines. Q. You mean you didn't take all of it? A. No. Q. You used sixty volts or something like that? A. Yes. Q. And you closed the switch

298 HAAS v. WASHINGTON WATER POWER CO.

at 11:45 or something? A. Yes, sir. Q. And that threw the power on the line towards Otis Orchards? A. Yes, sir. Q. And then what happened after that; did the switch open up again? A. No, sir, I opened it. Q. Well, you opened it; how long was it closed? A. About two or three seconds. Q. And then you opened it? A. Yes, sir. Q. And after that you closed it again, or did it remain open while you were on duty? A. It remained open. Q. Until you went off duty? A. Yes, sir."

On cross-examination he testified as follows:

"Q. Now, you were told from Spokane to put 120,000 volts on the high power wires? A. 20,000. Q. 120,000 were you? A. I did not put on 120,000. Q. How much did you put on there? A. I would have to figure that out. I put on 60,000 volts from the machine. Q. Does that make more than 60,000 volts? A. No, sir. Q. You put on all you could put on? A. No, sir. Q. You put the maximum voltage on the wires? A. I put on less than half. Q. That is, you put on 30,000 volts? A. Less than half. Q. 27,000 volts? A. Somewhere near that. Q. Now, then, when you did that, you did that at 11:37? A. No, sir. Q. What time? A. 11:45."

In response to interrogatories filed by plaintiffs, defendant answered that some disorder on the line was detected between 11 a. m. and 1 p. m. on the date in question, and that the high power wires between the hours of 11 a. m. and 1 p. m. were charged with approximately 63,000 volts of electricity.

It is plaintiffs' claim that the injury was caused by this charging of the high power wires with electricity when one of the wires was broken. Defendant, on the other hand, claims that this could not be because of the interposition of the transformer and the fuses, which would have prevented an excessive current of electricity from flowing over the line to the service wires leading into the premises where the injury occurred. The charges of negligence, stated briefly as may be, are these: That with full knowledge or with means of knowledge that the high power wire was broken and in contact with the distribution wires, defendant negligently and

without any attempt to ascertain where the break was, caused the broken wire to be connected with the generating machinery and caused it to be charged with a high voltage of electricity; that the transformer was out of repair, of which defendant had knowledge or means of knowledge, so that it did not protect the service wires leading to plaintiffs' premises from an overcharge of electricity; that defendant was further negligent in placing the distribution wires on the same poles with the high power wires and directly underneath them without being adequately insulated and without guards or other means of preventing the high power wires from falling on, over or against the distribution wires should the high power wires become broken or dislodged; that defendant was further negligent in failing to use an adequate and proper device known as a lightning arrester which, if properly installed, would have prevented any voltage greater than consistent with safety from entering the plaintiffs' premises. The first two of these allegations of negligence were found in paragraph 8 of the plaintiffs' amended complaint. The paragraphs of the plaintiffs' amended complaint were so misnumbered that no paragraph 7 appeared. Defendant, in its answer, denied the several allegations of negligence in the amended complaint by reference to paragraphs, and, it is claimed inadvertently, did not deny the allegations found in paragraph 8, but did deny the allegations of paragraph "7." The cause was tried to a jury, which returned a verdict in plaintiffs' favor for $6,016. Defendant moved for judgment *non obstante veredicto*, and in the alternative, for a new trial. The motion for judgment *non obstante veredicto* was granted. The motion for a new trial was not passed upon. Plaintiffs appeal.

Appellants first contend that, inasmuch as the allegations of negligence contained in paragraph 8 of the amended complaint were not denied by the answer, they stand admitted, and that therefore they establish such admitted negligence on respondent's part as to make the granting of judgment

*non obstante* manifest error. We are convinced that respondent's denials in paragraph 5 of its answer, though specifying paragraph "7" of the complaint, were intended to be addressed to the allegations found in paragraph 8 of the amended complaint. The evidence shows that, throughout the trial, the allegations of negligence contained in paragraph 8 were treated by the court and counsel on both sides as denied, the main controversy on the facts being waged upon those allegations. The theory upon which the trial proceeded cannot be rejected for the first time in the appellate court. *San Juan Light & Transit Co. v. Requena*, 224 U. S. 89; *Grant Brothers Construction Co. v. United States*, 232 U. S. 647, 661; *In re Lind's Estate*, 90 Wash. 10, 155 Pac. 159; *Driver v. Galland*, 59 Wash. 201, 109 Pac. 593; *Nielsen v. Northeastern Siberian Co.*, 40 Wash. 194, 82 Pac. 292; *Standard Furniture Co. v. Anderson*, 38 Wash. 582, 80 Pac. 813.

It is next contended that the court erred in refusing to grant judgment for appellants at the opening of the trial because of the failure of respondent to answer a certain interrogatory as follows: "State the exact time or times at which you turned on said current on said date between the hours of 11 a. m. and 1 p. m." Sometime prior to the trial, respondent had been ordered to answer the interrogatories, including this one, by the judge of another department of the superior court. When appellants moved for judgment, respondent's counsel objected to answering the interrogatory because it would show the exact time when the current was turned on, and thus enable appellants to shape their evidence so as to show that the accident occurred at that very time. The excuse is not a good one. The court would have just as much right to assume that, had appellants' evidence been first put in, the answer to the interrogatory would have been falsely framed to contradict the evidence, as it has to assume that, if the answer to the interrogatory were first put in, the appellants' evidence would be falsely framed to correspond

with that answer.  It cannot be assumed that either party would be more apt to give false testimony than the other, in the absence of some showing to that effect.  The court committed no error in holding that this interrogatory should be answered at once.  The answer was accordingly filed, stating that the current was turned on at 11:46 a. m.  But it does not follow that, because there was no sufficient excuse for not answering the interrogatory, the court erred in permitting it to be answered at the opening of the trial, and in not granting judgment for failure sooner to answer it.  The statute, Rem. 1915 Code, § 1230, makes the penalty for refusing to answer interrogatories the striking of the offending party's pleading and the rendition of judgment against him.  But in this case no motion was made to strike respondent's answer, but only a motion for judgment.  Since the penalty prescribed by the statute is a severe one, we do not think the courts should impose it except where the moving party brings himself within the terms of the statute.  Moreover, the interrogatory was answered before any evidence was introduced, and it does not appear that the failure to answer it earlier could have had any prejudicial effect upon the presentation of appellants' case.  We have been cited to no case in which the same circumstances as those here presented are found.  While the question presented is a close one, we are loath to hold, in the absence of a showing of injury, that a judgment should be rendered against the offending party where, as in this case, the interrogatory was answered in time to meet its original purpose.

Upon the main issue, as to whether the court erred in granting judgment notwithstanding the verdict, it is not only impracticable but unnecessary to discuss the extremely voluminous evidence in detail.  There was some evidence that, after the stroke of lighting which broke the wire and injured appellants' daughter, there was another violent flash of lightning which might have caused the injuries to Mrs. Haas.  The evidence as to this second flash was vague, and other

witnesses testified that it was perfectly clear at the time of the injury and that there was no second flash of lightning. There was also much testimony of expert witnesses to the effect that the charge from respondent's power house could not have passed to the service wires on appellants' premises so as to cause the injuries, because the fuse leading to the transformer had already been destroyed and because the ground wires on the pole would have carried the charge into the ground. Other experts, however, denied such impossibility and expressed the view that, even though the broken wire at the end which was charged did not touch the distribution wires, the wet wooden cross arm upon which it rested might have acted as a conductor sufficient to carry an excessive charge of electricity over the small insulators of the distribution wires and thence onto the service wires and cause the injury. The trial court seemed to be of the opinion, and so are we, that this evidence was sufficient to take to the jury the question whether or not the injury was caused by the current turned on at 11: 45 a. m. by the operator at Post Falls.

Whether in turning on this current there was negligent operation is a closer question. Every expert witness who testified upon the subject stated that respondent's appliances for detecting breaks or interruptions in the current on its high power transmission line were of the best and most approved type; that there is no apparatus known to science which, with a high power line such as that here involved, would do more than indicate trouble on the line, and that no apparatus would indicate the nature of the trouble. All of the witnesses were of the opinion that an indication of trouble on the switchboard, either in the Spokane substation or in the power house at Post Falls, would not mean that the trouble was serious or the line broken or in otherwise dangerous condition. Every witness who testified on the subject testified that, in the usual course of operation, the switches or other apparatus for indicating trouble show trouble of

some kind frequently, one witness said many times each day. In many instances—one witness said fully sixty per cent— the switch when closed again shows no further trouble, and in such cases the cause of the trouble is never known. It is therefore evident that the most that the tripout of the oil switch in Spokane and the indication of trouble at Post Falls showed at the time in question was that there was some trouble on the line, but did not indicate to anybody the nature of the trouble or whether it was serious or not. Every expert witness who testified on the subject said that the universal method and the only practical method of procedure on an indication of trouble was to apply about one-half of the normal voltage of the line to the wire, and that if the connection is maintained it indicates that the trouble has disappeared and the line is clear; that if the current will not go through, the switches will again trip out, thus indicating that there is an absolute break in the line or some other serious trouble. The point of the trouble is then located by sectionalizing the line, trying out one section after another until the break or obstruction is located between two given points and the exact location is then discovered by patrolling the line between those two points.

All of the witnesses agreed that the only practical test is to put a current into the troubled line at about one-half the normal voltage and, if it shows trouble, again keep the power off the line until the trouble has been located, in the manner we have mentioned, and removed. There was much discussion with one of the expert witnesses as to the theoretical possibility of testing with a very low voltage a line which shows trouble. The witness answered, in substance, that this could be done with a line of low tension, but would be absolutely impracticable with a line normally carrying a voltage of 60,000 or over, as does the one here involved. This is apparently because the size of the wire would be such as to offer so little resistance to a current of low voltage as to indicate nothing reliable. The evidence makes it reasonably plain,

therefore, that there are but two certain ways in which to test a line showing trouble in order to determine whether or not there is a break, the one being the method which was employed here, the other being to patrol the line on each indication of trouble. Since trouble is shown many times a day and in a majority of cases the trouble is not only not serious but immediately disappears, it is manifest that patrolling the line to look for the trouble would be wholly incompatible with any practical operation of the line. As said by the trial court, it is clear that if respondent was required to patrol the whole line every time a switch opened the line could not be operated, since before one patrol was completed another obstruction would have appeared. It was upon this ground that the trial court granted the motion, namely, that respondent, having done the only practical thing that could be done to determine whether or not there was a break in the line, was not guilty of negligence in so doing. It will be noted, however, that the normal capacity of the line in question was a little over 60,000 volts; that the test, as testified to by the experts, was to turn onto the line when trouble was indicated about one-half the normal voltage. The only person who could testify as to what was actually turned on, namely, the station operator at Post Falls, contradicted himself as to the force of the current which he applied. He first testified positively that he turned on between 60,000 and 70,000 volts. On cross-examination he repeated this, but finally reduced it to about 27,000 volts. If, in fact, his first statement was correct, he was clearly guilty of negligent operation, since, under all the evidence, the proper test requires no more than one-half of the normal voltage, and, obviously, the greater the voltage the greater the danger.

We have often held, in common with other courts, that those who are furnishing electric power, because of the extremely dangerous character of that agency, are charged with the highest degree of care, especially in their relation

with the public to whom they sell and distribute power. *Abrams v. Seattle,* 60 Wash. 356, 111 Pac. 168, 140 Am. St. 916; *White v. Reservation Elec. Co.,* 75 Wash. 139, 134 Pac. 807. The highest degree of care in such case is the highest degree of care compatible with practical operation. The conflict in the testimony of the Post Falls operator is further heightened by respondent's answer to the interrogatory that the line was charged with 63,000 volts at the time in question. It seems to us that the extreme doubt raised by respondent's own evidence as to the amount of current turned into this line to test it for trouble presented a question for the jury as to whether or not respondent was guilty of negligent operation. If the amount exceeded that required by the established tests, we cannot say, as a matter of law, that respondent was not guilty of negligence. Upon the evidence as presented, the question was for the jury.

In view of the fact that there may be another trial, we shall notice one other question. Appellants offered to show that, by the use of lightning arresters over the transformer, either lightning or excessive current from the disarranged high power wires above would have been so grounded as to prevent excessive current from entering appellants' premises. The court excluded this testimony on the ground that the question was one of statutory standard construction. We think this was error. While it is true that the act of 1913, Laws of 1913, ch. 130, p. 397 (Rem. 1915 Code, § 4976-1 *et seq.*), prescribes certain rules for the construction of electrical lines, that statute does not attempt to define every detail of construction, and we are inclined to hold that a compliance with the statute is not evidence of proper construction, except in those particulars covered by the statute.

Many pages of the briefs are devoted to a mooted application of the rule *res ipsa loquitur,* but we find it unnecessary to discuss that question, since the evidence, in any event, was sufficient to take to the jury the issue of negligence.

The judgment notwithstanding the verdict was improperly granted, but we cannot direct the entry of judgment on the verdict. The motion for a new trial remains undisposed of. In such a case, we have announced the rule that the cause should be remanded in order that the trial court may pass upon the latter motion. *Paich v. Northern Pac. R. Co.*, 88 Wash. 163, 152 Pac. 719.

The judgment is reversed, and the cause is remanded with direction to the trial court to pass upon the motion for a new trial and either grant a new trial or enter judgment on the verdict.

MORRIS, C. J., FULLERTON, CHADWICK, and MOUNT, JJ., concur.