Kenneth RICHARDSON,
Plaintiff-Appellant,

v.

The UNITED STATES of America,
Defendant-Appellee.

No. 79–4516.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 5, 1981.

Decided May 18, 1981.

Rehearing Denied Aug. 13, 1981.

David E. Williams, Critchlow, Williams, Ryals & Schuster, Richland, Wash., for plaintiff-appellant.

Robert M. Sweeney, Asst. U. S. Atty., Spokane, Wash., for defendant-appellee.

Before KENNEDY and BOOCHEVER, Circuit Judges, and REED,* District Judge.

REED, District Judge:

Kenneth Richardson appeals the judgment entered against him by the District Court on July 17, 1979, following a non jury

* Honorable Edward C. Reed, Jr., United States District Judge for the District of Nevada, sitting by designation.

trial, on his claim under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*

The original claim for relief was submitted to the Bonneville Power Administration (hereinafter BPA) on June 25, 1975, pursuant to 28 U.S.C. § 2675. A complaint against the BPA was subsequently filed in the trial court on September 30, 1975. Later, by agreement, the United States was substituted as the party defendant in place of the BPA.

The appellant's original claim, and now this appeal, derive from a most unfortunate occurrence on May 10, 1975, in Benton County, Washington. The appellant, an eighteen year old high school student, had gone to visit his sister and brother-in-law, Mr. and Mrs. Norman Trapp, at a farm they leased in Benton County. While there, he assisted his brother-in-law in moving irrigation pipes across a pasture. The irrigation pipes were of varying lengths and made of aluminum.

High-voltage power lines cross over the Trapp farm. The lines are known as the "Franklin-Hedges 115KV line" constructed and maintained by the BPA, an agency of the defendant. While no supporting structures are located on the farm, the line crosses that property between poles ⁴⁄₆ or ⁵⁄₆ and ⁴⁄₇, a span of some 776 feet. The line, composed of uninsulated aluminum and steel, sags to a low point of about 30 feet above the ground. The normal amount of energy transmitted through the line is approximately 35 MW. Direct contact with this high voltage line would be fatal.

At the time of the occurrence which is the subject of these proceedings, appellant and Trapp were carrying a forty-foot length of the irrigation pipe, horizontally, at hip level, with appellant at one end and Trapp at the other. In addition, Trapp carried a shorter piece of pipe, dragging one end on the ground and crossing over the longer piece of pipe.

As the two walked beneath the power line, lightning struck the line causing a short circuit from the line to the pipe being carried by appellant and Trapp. This phenomenon of electricity traveling through midair from the high voltage line to the ground by way of the pipe is termed "midpoint flashover."

As a result of this "midpoint flashover" the appellant and his brother-in-law were severely shocked and burned on their hands and lower portions of their bodies. Both were knocked unconscious and appellant's injuries later necessitated the amputation of his left leg.

Appellant presents one question on appeal:

Did the trial judge apply the proper legal standard in determining whether defendant was liable for the consequences of the electrical shock received by the appellant due to "midpoint flashover" from the high voltage transmission line?

Under the Federal Tort Claims Act, tort liability is determined by the law of the state where the act or omission complained of occurred. 28 U.S.C. §§ 1346(b), 2674. *See generally Southern Pacific Transportation Co. v. United States*, 462 F.Supp. 1193 (E.D.Cal.1978). The United States "shall be liable, ... in the same manner ... as a private individual under like circumstances..." 28 U.S.C. § 2674. The basic problem now presented to this Court is what was the proper standard of care, which should have been applied by the court below, according to the law in the State of Washington.

The trial court stated, in its conclusions of law, that the standard of care imposed upon a private power transmission line owner or operator is the "highest degree of care compatible with practical operation." Appellee supports this as the proper standard to apply, citing, *Hever v. Puget Sound Power and Light Co.*, 34 Wash.2d 231, 208 P.2d 886 (1949); *Scott v. Pacific Power and Light Co.*, 178 Wash. 647, 35 P.2d 749 (1934); *Hass v. Washington Water Power Co.*, 93 Wash. 291, 160 P. 954 (1916); *White v. Reservation Electric Co.*, 75 Wash. 139, 134 P. 807 (1913); *Mayhew v. Yakima Power Co.*, 72 Wash. 431, 130 P. 485 (1913).

It is appellant's position that the proper standard of care imposed upon the BPA

was "the highest degree of care that human prudence is equal to." Appellant argues that the qualification in the standard of care applied by the judge, "compatible with practical operation of the utility," has not been used since 1949, the date of the *Heber* decision, *supra. See Vannoy v. Pacific Power and Light Co.*, 59 Wash.2d 623, 369 P.2d 848 (1962), *Frisch v. Public Utility District*, 8 Wash.App. 555, 507 P.2d 1201 (1973) and *Wray v. Benton County P.U.D.*, 9 Wash.App. 456, 513 P.2d 99 (1973); *See also Amant v. Pacific Power and Light*, 10 Wash.App. 785, 520 P.2d 181 (1974).

At first glance it appears that to distinguish the two standards would be but a mere exercise in semantics. A closer look at the application of each to the facts originally at issue in this case creates a meaningful difference that may have substantially affected the trial court's judgment.

At trial appellant argued that certain precautions, such as the installation of ground or "shield" wires, might have prevented the accident. On the other hand, appellee contended and the trial court found that though these ground wires dissipate the effect of lightning on the lines, their use was to prevent power outages and to insure system reliability. The court also found that such ground wires may or may not have prevented a "midpoint flashover."

The BPA did not use ground wires in the area of the accident. The BPA did use the ground wires on other portions of the Franklin-Hedges line and over other lines which transmit extra high voltage in the 345–500 KV range. The court found that the installation of ground wires over all power lines would be impractical because of the high cost in comparison to possible benefits, and thus would burden the practical operation of the utility. This was especially true in light of the trial court's determination that the probability of "midpoint flashover" is extremely remote.

The evidence as to whether or not this occurrence was foreseeable, and whether or not it could have been prevented, was through the testimony of Dr. William Lewis, an electrical engineer and expert for the plaintiff, and Mr. Yasuda, the head of the High Voltage Unit and System Reliability for the BPA. It appears the trial court, having heard the testimony and judged its credibility, chose to adopt the testimony presented by appellee's expert, Mr. Yasuda. He presented credible evidence to support the trial court's findings of fact and this Court is bound by those findings unless clearly erroneous. *See* Fed.R.Civ.P. 52(a); *Roemer v. Maryland Public Works Board*, 426 U.S. 736, 758, 96 S.Ct. 2337, 2350, 49 L.Ed.2d 179 (1976).

Without concerning itself with the findings of fact, or whether the trial court's judgment would be the same under either of the standards of care contended for, this Court must determine first if the two standards do in fact differ.

The existence of a distinction is relevant to determine the possibility that the trial court may have considered the various factors of foreseeability, practicality, expense, benefit, and prudence in a different light.

Appellant relies on three of the most recent Washington decisions relevant to this case. *Wray, supra*; *Frisch, supra*; and *Vannoy, supra*. Those cases involve personal injury actions against electrical utilities in regard to their liability arising from the maintenance and control of outside, high-voltage lines. All three rely on the standard set forth in *Vannoy, supra*, 369 P.2d at 852–53, i.e., "the highest care that human prudence is equal to."

Appellee asserts that its cases, the latest of which was decided in 1949, state the relevant standard applicable, i.e., "the utmost care and prudence consistent with practical operation of its plant ..." *See Heber, supra*; *Scott, supra*; *White, supra*.

The difficulty of determining the proper standard of care in this case stems from the confusing evolution of the present standard applied by Washington courts. This point is most clearly illustrated by reference to the cases cited by both parties on appeal. *Vannoy*, the principal case relied on by appellant to support his interpretation of the proper standard of care, apparently is de-

rived from the standard set forth in *Scott*, a case cited by appellee in support of its proposed standard of care.

*Vannoy* cites *Scott* as the basis of its standard as follows:

" ' * * * the amount of care necessary varies with the danger which is incurred by negligence, for a prudent and reasonable man increases his care with the increase of danger. If but little danger is incurred, as, for instance, when the wires carry only a harmless electric current, such, for instance, as the telegraph or telephone current, only ordinary care may be required. While if the wires carry a strong and dangerous current of electricity, so that negligence will be likely to result in serious accidents, and perhaps death, or if a harmless wire is in dangerous proximity to a high tension wire, a very high degree of care, indeed, the highest that human prudence is equal to, is necessary. This is particularly true of electric light and electric railway wires, which carry a high tension current often of great danger. * * * ' "

*Vannoy, supra*, 369 P.2d at 852–53, citing *Scott, supra*, 35 P.2d 751. This quotation from the *Scott* opinion follows a portion of the opinion cited by the appellee which contains the provision stating that the duty imposed on a utility was to exercise the "utmost care ... consistent with practical operation...." *Scott, supra*, 35 P.2d at 751, citing, 9 R.C.L. § 13 at 1199.

Further along in the *Scott* case the Washington court states:

Where death or serious injury may be caused by an agency lawfully in use, ordinary care requires that every means known, or that with reasonable inquiry would be known, must be used to prevent it.

It may be stated as a general principle of law that one who has in his possession or under his control an instrumentality exceptionally dangerous in character is bound to take exceptional precautions to prevent an injury being done thereby.... While no absolute standard of duty in dealing with such agencies can be

prescribed, it is safe to say, in general terms, that every reasonable precaution suggested by experience and the known dangers of the subject ought to be taken. *Scott, supra*, 35 P.2d at 752. This, when coupled with the conflicting cases cited elsewhere in *Scott*, makes it difficult to pin down just exactly what standard was enunciated by the Washington court in *Scott*. 35 P.2d at 752–53, *citing e.g., McLaughlin v. Louisville Electric Light Co.*, 100 Ky. 173, 37 S.W. 851, 34 L.R.A. 812 (utmost care standard, expense or inconvenience no excuse) and *Fitgerald v. Edison Electric Illuminating Co.*, 200 Pa. 540, 50 A. 161, 86 Am.St. Rep. 732 (correct standard applied was highest degree of care practicable). Thus, *Scott* may be interpreted to favor either of the parties to this appeal.

The Washington courts, however, in *Vannoy* and its progeny, have chosen not to qualify the standard of care imposed on a utility by the words practical or practicable. While it is true that they have not expressly revoked the "compatible with practical operation" language from the standard enunciated in *Scott*, no cases since 1949 have included those terms in the standard of care imposed on a public utility. It would be unreasonable to infer that these later courts meant to include those words, especially since they are incompatible with the highest degree of care human prudence is equal to.

The trial court's findings of fact reflect that the court made a cost-benefit analysis in arriving at the judgment in this case. The court specifically found that the expense of the precautions appellant asserted should have been taken, i.e., the installment of ground wires, would not be justified in relation to the likelihood that they would have prevented any injury.

The result below might have been different had the trial court imposed the highest duty of care, short of insurer's liability, upon the BPA. *See Vannoy, supra*, 369 P.2d at 853. Though not absolute or strict liability, (which cannot be imposed on the United States, *see Laird v. Nelms*, 406 U.S. 797, 802–03, 92 S.Ct. 1899, 1902–03, 32 L.Ed.2d 499 (1972)), the proper expense-

benefit ratio would be different where practicality is not taken into consideration.

"The highest degree of care compatible with practical operation" does not equate with the "highest degree of care that human prudence is equal to." The latter requires that every means known, or which with reasonable inquiry would have been known, be used to prevent death or serious injury in these circumstances. The former, by the qualification "compatible with practical operation" allows expense and efficiency to balance more heavily against the risk involved than would be allowed under the other standard. The most prudent man would be less concerned with the practical operation of the utility.

The Washington courts have chosen to impose a higher standard than applied by the trial court. This standard of care may have caused a different result in this case. The judgment of the trial court is reversed and the case remanded for a new trial consistent with this analysis.