Beulah BROWN, Plaintiff,

v.

POTOMAC ELECTRIC POWER COM-
PANY, Defendant.

Civ. A. No. 2486–60.

United States District Court
District of Columbia,
Civil Division.

June 15, 1964.

King David, Washington, D. C., for plaintiff.

Thomas A. Flannery, Hamilton & Hamilton, Washington, D. C., for defendant.

ROBINSON, District Judge.

The defendant is a corporate public utility engaged in the business of selling and distributing electricity in the District of Columbia. On the date of the events from which this litigation arose, the plaintiff resided in the house numbered 4025 Gault Place, Northeast, which is situated on the southern side of that street, and was a customer of the defendant.

The defendant maintained overhead distribution lines supported by a series of 30-foot poles extending along the southern side of Gault Place, Northeast, between the property line and the curb of the street. At the top of each pole was a horizontal crossarm with pins to which wires transmitting electricity could be attached. The poles in the vicinity of the plaintiff's home supported three primary lines each consisting in an uninsulated wire conducting approximately 2,300 volts of current. These passed within 16 to 20 feet of the front of the plaintiff's house at a height of about 28 feet above the ground.

To reduce this high voltage to the point usable for residential purposes, a primary line was connected to a transformer which converted the voltage from 2,300 to 110 and the reduced current was then conducted through a secondary line, located about four feet below the primary line, for distribution in the neighborhood.

To the secondary line was connected a two-wire 110-volt insulated service line extending from a pole to the plaintiff's house, at a point approximately 17 feet above grade, and from there to a combination meter-fuse box located in a corner inside a relatively small bedroom at a height of about a foot above the floor. This was a metal box, about eight inches wide and ten inches high, which housed six fuses behind a hinged metal door, with a switch on one side and a meter on top having a face approximately six inches in diameter.

Early one morning a primary line parted in front of the plaintiff's residence, and one segment of the broken line fell across and burned through both wires of the service line leading to her house. There was an electrical explosion causing considerable noise, and a bright light created by burning wires. The momentary contact of the primary and service lines caused an instantaneous surge of excessive voltage to the meter-fuse box in the bedroom, in which the plaintiff was then asleep, which blew part of a fuse from the box into the room.

The plaintiff testified that she was awakened by a loud noise, bright light and smoke which emanated from the box. Other witnesses for the plaintiff said that there was smoke in the bedroom and damage to the fuse box and meter, and that the blown portion of the fuse had disintegrated. Evidence for the defendant tended to show that while an electrical arc occurred at the fuse, the resulting smoke was not excessive nor the light intense, and that the part of the fuse cast from the box remained intact. It also tended to show that neither the meter nor the fuse box was damaged or marked except for a weld of the fuse threads to its casing in the box and a small dark smudge on the outside of the meter. There is, too, considerable controversy as to the arrangement of furniture within the room and the plaintiff's position with reference to the box. Her testimony that her head was at the foot of the bed a few feet from the box is challenged by the defendant's efforts to show that she occupied a normal position in the bed with her head considerably more distant therefrom. But despite the volume of evidence adduced on these competing theories, other considerations are dispositive of the case.

Whatever the electrical reaction within the bedroom may have been, or the plaintiff's bodily relation to it, she received a severe nervous shock the mani-

festations of which endured for a considerable period thereafter. On the theory that the defendant was negligent in some way, she seeks damages by this action. In denying recovery the Court in this opinion states the facts it has found and expresses its legal conclusions thereon.[1]

There is no evidence tending to show directly that the defendant failed to keep its wires and equipment in proper operating condition or to maintain the meter-fuse box in the plaintiff's house in a safe condition. There is, indeed, no evidence whatsoever that could point to any specific act of negligence on the part of the defendant. The plaintiff rested her case entirely upon the doctrine of res ipsa loquitur and must stand or fall on that basis.

 The defendant is not an insurer of the safety of its distribution system, and is not liable for injuries resulting from its operation unless guilty of some negligent act or omission.[2] It is, however, required to exercise a degree of care reasonably commensurate with the danger inherently involved,[3] and is accountable to any person to whom

it owed that duty for harm resulting from its nonperformance.

 Such a breach of duty undoubtedly may be established through application of the doctrine of res ipsa loquitur.[4] Though a doctrine always to be applied with caution,[5] it may be assumed that it is properly invoked here.[6] Even so, it "is nothing but a picturesque way of describing a balance of probability on a question of fact on which little evidence either way has been presented."[7] At most, it only authorizes a permissible inference of fact.[8] It "simply means that there arises from the circumstances of the accident an inference of negligence, which is not a presumption but a mere mechanical device that requires the trier of fact—whether judge or jury—to consider the evidence to see whether its preponderance shows the defendant's negligence. The inference, even standing alone, may be rejected by the trier of fact."[9]

 It is well established in this jurisdiction that application of the rule of res ipsa loquitur does not shift the burden of proof, and that when all the evi-

1. Federal Rules of Civil Procedure, Rule 52(a).

2. Dierks Lumber & Coal Co. v. Brown, 19 F.2d 732, 735 (8th Cir. 1927). See also the cases cited infra note 14.

3. American General Ins. Co. v. Southwestern Gas & Electric Co., 115 F.2d 706, 708 (5th Cir. 1940); Smith v. Appalachian Electric Power Co., 74 F.2d 647, 651 (4th Cir. 1935); Illinois Power & Light Corp. v. Hurley, 49 F.2d 681, 689 (8th Cir. 1931), cert. denied 284 U.S. 637, 52 S.Ct. 19, 76 L.Ed. 541 (1931).

4. Futrell v. Arkansas-Missouri Power Corp., 104 F.2d 752 (8th Cir. 1939); Alabama Power Co. v. Davidson, 206 Ala. 501, 90 So. 915 (1921); Joyce v. Missouri & Kansas Telephone Co., 211 S.W. 900 (Mo.App.1917).

5. Lazarus v. Eastern Air Lines, Inc., 110 U.S.App.D.C. 255, 257, 292 F.2d 748, 750 (1961); Kight v. Metropolitan R. R., 21 App.D.C. 494, 508 (1903).

6. "The principle behind the phrase is one of inclusion, not exclusion. A plaintiff whose case comes within the principle is entitled to go to the jury, but no plaintiff who makes a probable case is disentitled to go to the jury by the fact that his case does not come within it or goes beyond it." Washington Loan & Trust Co. v. Hickey, 78 U.S.App.D.C. 59, 61, 137 F.2d 677, 679 (1943).

7. Washington Loan & Trust Co. v. Hickey, supra note 6, 78 U.S.App.D.C. at 61, 137 F.2d at 679, quoting Thayer, Liability Without Fault, 29 Harv.L.Rev. 801, 807 (1916).

8. Pennsylvania R. R. v. Pomeroy, 99 U.S. App.D.C. 272, 283, 239 F.2d 435, 440 (1956), cert. denied 353 U.S. 950, 77 S.Ct. 861, 1 L.Ed.2d 859 (1957); Underwood v. Capital Transit Co., 87 U.S. App.D.C. 68, 69–70, 183 F.2d 822, 823 (1950); Washington Loan & Trust Co. v. Hickey, supra note 6, 78 U.S.App. D.C. at 61, 137 F.2d at 679; Brown v. Capital Transit Co., 75 U.S.App.D.C. 337, 338, 127 F.2d 329, 330 (1942), cert. denied 317 U.S. 632, 63 S.Ct. 61, 87 L.Ed. 510 (1942).

9. Martin v. United States, 96 U.S.App. D.C. 294, 297, 225 F.2d 945, 948 (1955).

dence is in, the question still is whether the preponderance is with the plaintiff.[10] As expressed by the Supreme Court,[11]

> "[R]es ipsa loquitur means that the facts of the occurrences warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they forestall the verdict. * * * When all the evidence is in, the question for the jury is whether the preponderance is with the plaintiff."

While the evidence does not suggest that a break in a primary line is a common occurrence, it does show that it could occur from phenomena unassociated with negligence on the defendant's part. A windstorm, a bolt of lightning, a blow to a supporting pole, and contraction of the wire itself in cold weather, are among the possible causes. And the evidence pointed to previous occasions upon which a severance was caused by a foreign object lodged across the primary wires.

An employee of the defendant of unimpeached qualifications expressed the opinion that a foreign object cast across the primary wires caused one to burn and fall. He arrived on the scene of the explosion shortly after it occurred and found baling wire, of the type used to bind stacks of undelivered newspapers, in the immediate vicinity of the break. The baling wire had been burned by electricity, and there was another burn

on the primary line, confined to a small area at the point where it was severed, denoting contact with a foreign object. He pointed out that the broken primary wire had ends that were molten and rounded at the point of severance, and that the broken ends would instead have been tapered if the wire had parted because of wear or strain. There was also testimony that the block in which the plaintiff lived was frequently used as a place where newspaper carriers received their papers for delivery. The explanation afforded by this evidence is that a piece of baling wire, previously used to bind newspapers left in the vicinity for delivery, had been thrown by some third person upward across the wires at the top of the pole, causing a primary line to burn and break.

In order to attach liability to the defendant here, this uncontradicted testimony would have to be completely rejected and a preponderance in the plaintiff's favor found. But in weighing the entire evidence in the light of the burden resting upon the plaintiff, the case against the defendant is not proved. The Court finds that the defendant is guiltless of any negligence, and that the accident resulted from the unforeseeable act of some third person in fouling the primary line with baling wire, causing the explosion and the consequences of which the plaintiff complains.

The plaintiff argues, however, that the defendant should be held liable because, as shown by uncontradicted evidence, its primary line was not insulated. It is recognized, of course, that an exercise of prudent care would require proper insulation of wires and appliances in places where there is a substantial prob-

10. Sweeney v. Erving, 228 U.S. 233, 240, 33 S.Ct. 416, 418, 57 L.Ed. 815 (1913) affirming 35 App.D.C. 57, 43 L.R.A.,N.S., 734 (1910); Martin v. United States, supra note 9, 96 U.S.App.D.C. at 297–298, 225 F.2d at 947–948 (1955); Capital Transit Co. v. Jackson, 80 U.S.App.D.C. 162, 164, 149 F.2d 839, 841, 161 A.L.R.

1110, 1112 (1945), cert. denied 326 U.S. 762, 66 S.Ct. 143, 90 L.Ed. 459 (1945); F. W. Woolworth Co. v. Williams, 59 App.D.C. 347, 348, 41 F.2d 970, 971 (1930).

11. Sweeney v. Erving, supra note 10, 228 U.S. at 240, 33 S.Ct. 416, 57 L.Ed. 815.

ability of human contact therewith.[12] But the primary line here was maintained by poles and crossarms at a height of nearly 30 feet above the ground.[13] The duty to insulate does not extend to properly suspended overhead wires so located that no one could reasonably be expected to come in contact with them [14] and, even if such a duty had existed, negligence arising from a failure to perform that duty would not, in view of the unforeseeable intervening act of some third person in fouling the line with baling wire, constitute the proximate cause of the plaintiff's injuries.[15]

In addition to these considerations the plaintiff faces another legal obstacle presented by the character of the injury for which redress is sought. She undoubtedly was badly frightened and shocked emotionally by the unexpected explosion and the events that followed it; she managed to make her way from the bedroom to the front porch of the house, but fainted there and did not regain consciousness until several hours later while lying in a hospital bed. Much of the evidence relates to her physical condition during the period following the accident, for the consequences of which sizeable damages are claimed.

The expert testimony attributes practically all of the plaintiff's medical problems to a severe emotional upset.[16] The only injury which could possibly be considered physical in character was a condition in her right eye.[17] After the explosion the eyelid was swollen, the eyeball inflamed and the eye teared profusely. But even this condition is of questionable relationship to the accident [18] and was of very short duration.

12. Postal Telegraph Cable Co. v. Jones, 133 Ala. 217, 32 So. 500 (1902); Brown v. Edison Electric Illuminating Co., 90 Md. 400, 45 Atl. 182, 78 Am.St.Rep. 442, 46 L.R.A. 745 (1900); City of Marlow v. Parker, 177 Okl. 537, 60 P.2d 1044 (1936); Runyan v. Kanawha Water & Light Co., 68 W.Va. 609, 71 S.E. 259 (1911).

13. It is to be noted that the lower service line to the plaintiff's house was insulated.

14. Croxton v. Duke Power Co., 181 F.2d 307 (4th Cir. 1950); Rudd v. Public Service Co., 126 F.Supp. 722 (N.D. Okl.1954); Arkansas Power & Light Co. v. Lum, 222 Ark. 678, 262 S.W.2d 920 (1953); Callaway v. Central Georgia Power Co., 43 Ga.App. 820, 160 S.E. 703 (1931); Dilley v. Iowa Public Service Co., 210 Iowa 1332, 227 N.W. 173 (1929); Bunten v. Eastern Minnesota Power Co., 178 Minn. 604, 228 N.W. 332 (1929); Daniel v. Oklahoma Gas & Electric Co., 329 P.2d 1060 (Okl.1958); Williams v. City of Sumpter, 149 S.C. 375, 147 S.E. 321 (1929).

15. Alabama Power Co. v. Cooper, 229 Ala. 318, 156 So. 854 (1934); Carr v. Kentucky Utilities Co., 301 S.W.2d 894 (Ky.1957).

16. The testimony of the plaintiff's medical experts, considered as an entirety, establishes that all of her medical problems, with the possible exception of the eye condition discussed in the text, were caused solely by fright and emotional shock. In view of the plaintiff's burden to prove recoverable damages, see Bowdoin v. Chicago Express, 125 F.Supp. 341 (N.D.Ind.1954); Gladysz v. United States, 100 F.Supp. 205 (M.D.Pa.1951), the defendant's evidence of lack of any physical injury becomes largely cumulative.

17. While there was some indication of a leg contusion, the evidence on this score is too vague and unsatisfactory to establish a connection with the accident.

18. Only one opthalmologist testified. He expressed the opinion that this condition could have been caused by the accident but stated that both the force of the electrical reaction within the bedroom and the proximity of the plaintiff to it were factors important to such a determination. These, of course, were two of the matters as to which there is much dispute in the evidence, and it is obvious that the validity of the witness' conclusion depends upon the completeness and accuracy of the accident history furnished him by the plaintiff. Her testimony at the trial conflicted on several important factual issues with the testimony of other witnesses and with her own statements in a pre-trial deposition. Furthermore, the opthalmologist's recital of the accident facts indicates that the information given him in this regard was meager and incomplete. He also testified that if the plaintiff's eyes were closed the possibility of an effect on the eye was minimized, and it is recalled that she says she was asleep.

In any event, there is no evidence that the plaintiff's emotional reaction is traceable to the eye condition or any other physical injury allegedly sustained in the accident.

■ It has long been the rule in the District of Columbia that there can be no recovery for negligently caused mental disturbance or emotional distress, or any consequence thereof, which is not traceable to a substantial physical injury.[19] "The law does not, and doubtless should not, impose a general duty of care to avoid causing mental distress. For the sake of reasonable freedom of action, in our own interest and that of society, we need the privilege of being careless whether we inflict mental distress on our neighbors."[20]

■ Had the plaintiff shown material physical injury resulting from the defendant's negligence, she might recover damages not only for the injury itself but for mental suffering incidental thereto as well.[21] But even if it were clearer that the eye condition was related to the accident, and that it could be deemed physical in character, it would lend no real assistance to the claim.[22] Trial courts are admonished that where "there has been no substantial physical injury, a jury ought not to be permitted to indulge in conjecture and speculation as to the effects of alleged nervous shock or fright."[23] No greater license in this case is derived from the fact that the Court is the trier of the facts. The eye condition at best is of trivial consequence, not only in itself, but also when compared with the magnitude of her problems that are nervous in origin. It cannot serve to support the elaborate recovery sought.

19. Chesapeake & Potomac Telephone Co. v. Clay, 90 U.S.App.D.C. 206, 194 F. 2d 888 (1952); Perry v. Capital Traction Co., 59 App.D.C. 42, 32 F.2d 938 (1929), cert. denied 280 U.S. 577, 50 S.Ct. 31, 74 L.Ed. 627 (1929); Washington & Georgetown R. R. v. Dashiell, 7 App.D.C. 507 (1895); Hamilton v. Pepsi Cola Bottling Co., 132 A.2d 500 (D.C.Mun.App.1957), appeal dismissed, 102 U.S.App.D.C. 256, 252 F.2d 637 (1958), cert. denied, 356 U.S. 961, 78 S.Ct. 1000, 2 L.Ed.2d 1068 (1958); Darrin v. Capital Transit Co., 90 A.2d 823 (D.C.Mun.App.1952). See also Thompson-Starrett Co. v. Warren, 38 App.D.C. 310, 313–314 (1912). While Perry v. Capital Traction Co., supra, was criticized in Clark v. Associated Retail Credit Men, 70 App.D.C. 183, 185, n. 6, 105 F.2d 62, 64, n. 6 (1939), the principle was later reaffirmed in Chesapeake & Potomac Telephone Co. v. Clay, supra. The rule is different in instances of torts that are intentionally inflicted. Clark v. Associated Retail Credit Men, supra; Capital Traction Co. v. Morgan, 44 App.D.C. 237, (1915); but see Hunt v. Calacino, 114 F.Supp. 254 (D.D.C. 1953).

20. Clark v. Associated Retail Credit Men, supra note 19, 70 App.D.C. at 185, 105 F.2d at 64.

21. McDermott v. Severe, 202 U.S. 600 (1906), affirming 25 App.D.C. 276 (1905); Perry v. Capital Traction Co., supra note 19; Thompson-Starrett Co. v. Warren, supra note 19; Washington & Georgetown R. R. v. Dashiell, supra note 19.

22. It would appear that under these conditions the plaintiff might recover the amount of the opthalmologist's bill for services, but even this is foreclosed by the holding that the defendant was not negligent.

23. Perry v. Capital Traction Co., supra note 19, 59 App.D.C. at 44, 32 F.2d at 940. See also Chesapeake & Potomac Telephone Co. v. Clay, supra note 19, 90 U.S.App.D.C. at 208, 194 F.2d at 890–891; Hamilton v. Pepsi Cola Bottling Co., supra note 19, 132 A.2d at 503–504.