HARTFORD CASUALTY INSURANCE
COMPANY, Plaintiff,

v.

POTOMAC ELECTRIC POWER
COMPANY, Defendant.

Civil Action No. 95–1725 (PJA).

United States District Court,
D. Columbia.

May 22, 1996.

Vincent T. Bambrick, Jeffrey A. Wothers, Baltimore, MD, for Plaintiff.

Ronald C. Jessamy, Samuel Y. Botts, Washington, DC, for Defendant.

## MEMORANDUM OPINION

ATTRIDGE, United States Magistrate Judge.

The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332. The parties have waived their right to a jury trial and have consented to trial and entry of a final judgment by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1) & (3).

### Background of Case

On August 5, 1993, a building located at 5609 Georgia Avenue, N.W., Washington, D.C. 20011 was destroyed by fire. The building was owned by GLM Partnership and leased to Morton Corporation, trading as Morton's. At the time of the incident, Morton's and the partnership were insured by the Plaintiff, Hartford Casualty Insurance Company ("Hartford") which paid them for the losses they sustained as a result of the fire. In turn, Hartford became subrogated to all rights that Morton's and GLM Partnership had for damages up to the extent of Hartford's payments. Hartford now seeks to recover from Potomac Electric Power Company ("Pepco") the money it paid its insureds alleging that Pepco was negligent in failing to properly install, inspect and maintain a watthour meter and watthour meter box[1] and breached its contract with its insured by failing to supply electricity in a safe manner; in failing to install equipment that would allow the safe distribution of electricity; in providing defective equipment; and in failing to take the necessary steps to inspect, maintain, repair and monitor its equipment installed on the Morton premises.

Pepco denies all allegations of negligence and breach of contract and denies that the fire was caused at the watthour meter or watthour meter box. It contends the fire originated at a site other than the watthour meter, and that the original fire later enveloped the watthour meter causing a secondary fire at its site. Pepco further alleged that Hartford's losses were caused by the sole and/or contributory negligence of the Morton's store manager because he failed to notify Pepco when the lights flickered and later went off and when the air conditioning unit began to hum.

---

1. A watthour meter is an instrument for measuring and recording the quantity of electricity furnished a user by the power company. The watthour meter box is an electrical box through which passes electric cable used to provide electricity to a premises. The supply end of the service cable is affixed the base or socket adaptor of the watthour meter by means of set screws. After recordation the electricity exits the meter

## Discussion [2]

On August 5, 1993, shortly before 9:00 a.m., Sherman G. Ethridge, the store manager of Morton's Department Store, located at 5609 Georgia Avenue, N.W., Washington, D.C., arrived at the premises to begin his routine for opening. Upon entering the store, Ethridge turned off the store alarm, turned on some of the lights and telephoned his Virginia office to advise that he had arrived at the store. He then proceeded to a back office where he continued his routine preparations of opening the store. After leaving the back office, Ethridge proceeded to turn the lights on within the store starting with the Sportswear and Men's Departments and then to the Girls and Lingerie Departments, which had a separate light switch. He then proceeded to the Dress Department to turn on yet another set of lights. On his return from the Dress Department, Ethridge noticed the lights flicker and heard a humming sound, then the lights in the Girls Department and Lingerie went out. The Dress Department lights remained on. Ethridge flicked the light switch for the Girls Department off and on. However, the lights did not come back on so he left the wall switch to those lights in the off position.

At about that time, Ms. Parker, the head of the Boys Department, arrived. Ethridge informed her the lights were out and explained that on his return from breakfast he would check the circuit breaker or fuse box to see if that was the cause of the outage.

On his return from breakfast at a nearby deli, and while still on the outside of the store, Ethridge saw smoke coming out of the building at a point where the Girls Department and Lingerie Department met. He ran into the store to warn the employees and tried to call 911 from the telephone at the entrance door as well as from his office but neither telephone was working. Ethridge ran across the street and called 911 from another premises. Shortly thereafter the fire department arrived.

The electrical circuit panels and meter were located in the basement of the store directly below the Girls' Department. The room in which the electric circuitry and meter were located had a ceiling height of about six and one-half feet. Ethridge, who is six feet three inches tall, barely had room to stand up. The watthour meter and electric circuitry was mounted on a four feet by eight feet plywood panel which was affixed to the south wall of the room. The watthour meter was mounted about five feet above the floor which was concrete. The room was divided by a partition and the area behind the partition served as a storage area. However, nothing was stored in the portion of the room in which the electric circuitry was located. The ceiling was of wood construction and the floor above was supported by two by twelve inch wooden joists.

The call to the fire department was made about 9:40 a.m. When Harold Lindsey, a District of Columbia Fire Department Inspector, arrived on the scene, the building was fully engulfed in flames. The fire burned completely through the basement ceiling. The joist directly over the area of the watthour meter was completely burned through. The joists to the east of the area where the watthour meter had been located were heavily charred on the west side with little or no charring on the east side of the joists. The extent of fire damage decreased as Lindsey proceeded north from the area of the watthour meter panel board. A portion of the watthour meter and service box were recovered from the debris and found to have sustained heavy copper beading caused by melting copper wire.

The melting point of copper is 1984 degrees Fahrenheit. Fires fueled by combustible materials do not reach a temperature sufficient to melt copper. Therefore, based on his observations and training, Lindsey concluded that this fire was caused by an electrical fault and originated at the watthour meter.

Thomas R. Dibley, a Hartford insurance adjuster, learned of the fire and arrived at

into cables also secured at the bottom of the base or socket adaptor by set screws.

2. This discussion states the facts found by the court as well as the factual and legal conclusions drawn from those facts. Fed.R.Civ.Proc. 52(a).

the scene during the afternoon of August 5. He contacted Ward Caddington, a Fire Investigation Consultant. Mr. Caddington estimated the ceiling height in the basement in the area of the watthour meter to have been approximately six feet. He determined this by counting the rows of brick from the floor to the area of the floor joists on the brick wall on which the meter panel board was mounted. The rows totaled twenty-five in height. This estimate was corroborated by Ethridge's statement to him that he (Ethridge) was six feet three inches tall and had to duck somewhat when standing in front of the meter panel board. Caddington estimated the meter to have been mounted eighteen to twenty-four inches below the ceiling. He concluded that the origin of the fire was the electrical panel board at the site of the watthour meter and that the plume of hot gases generated by the fire on the panel board pinched against and ignited the ceiling joists and, after the burn through, the combustible materials located on the first floor. He opined that an electrical event ignited the panel board which in turn ignited the joists and ceilings.

The plaintiff's principal expert witness as to the electrical event that triggered the fire was George McDuffie. Dr. McDuffie has a doctoral degree in electrical engineering from the University of Maryland. He is retired from Catholic University, where he served as a faculty member doing teaching and research for many years. While still employed at Catholic University and following his retirement, he has served as a self-employed consultant in electrical engineering matters. He was retained by Hartford to determine the cause of the electrical event that led to the fire which destroyed the Morton premises. McDuffie arrived on the scene on August 7, two days after the fire. He returned on August 9 and began an examination of the electrical equipment recovered from the debris. He took the remains of the watthour meter and meter box to his shop for further examination and tests in a laboratory setting.

McDuffie found no evidence of electrical malfunction in the electric cables that served the building and found no evidence of electrical activity in the equipment mounted on the panel board to the left or down stream from the watthour meter. He also examined other watthour meters which serviced other parts of the building and determined that none of the other meters had malfunctioned. McDuffie believed that the humming sound that Ethridge heard was caused by electrical arching at the watthour meter mounted on the panel board in the basement below the Girl's Department.

The watthour meter is composed of two principal parts—the base or socket adaptor which is mounted on a wall and the face which contains rotating discs and a series of dials. Within the socket adaptor there are located seven clamps or jaws. On the back of the face part of the meter there are located seven matching prongs or blades. The meter is properly and fully assembled by inserting the blades on the rear of the face into the jaws of the socket adaptor. The unit is then covered with a clear plastic cap, which in turn is locked in place by a retaining ring. The retaining ring cannot be fully secured unless the blades are fully inserted into the jaws.

The watthour meter retrieved from the fire debris had four of the seven blades missing; more probably melted as a consequence of the heat generated by arching activity. Two of the three remaining blades had evidence of severe arching damage and the one remaining blade had minimal arching damage. In addition, the insulation that normally covers the connectors leading to and from the jaws was burned off and the rotator disk had a v cut likely caused by electrical arching.

Dr. McDuffie testified that the arching process involved in this event took about ten to twenty seconds to occur and was manifest by an audible humming sound; that during the arching process heat in the range of two thousand to seven thousand degrees Fahrenheit is reached which is more than sufficient to melt copper and steel; and, that the electrical arching ignited the panel board to which the meter was affixed.

He further testified that he was not able to determine the specific malfunction giving rise to the arching (Tr. Jan. 17, 1996 P.M. at 67)

but that the more probable cause was the blades/jaw connection. "You can get arching and burning while a blade is still in the jaw if there is sufficient resistance between the good contact on the blades and the good contact on the jaw. And that resistance could come about by corrosion and degradation of that jaw/blade contact." *Id.* at 69.

Arching and burning may occur even while a blade is seated in the jaws if there is sufficient resistance between the good contact on the blades and the good contact on the jaws. The resistance causing the heat building is caused by contamination, and contamination or corrosion may occur even if the blades are fully seated in the jaws. (Tr. Jan. 17, 1996 P.M. at 10, 11).

Dr. McDuffie did not testify as to what Pepco did or failed to do that contributed to the arching. Nor did he testify as to the violation by Pepco of any industry standards in the installation, inspection or maintenance of the watthour meter. He hypothesized that corrosion could cause resistance which leads to heat build up and a loosening of the jaw/blade connection with further corrosion and eventual arching. Moreover, the corrosion could be caused by moisture in the atmosphere (Tr. Jan 17, 1996 P.M. at 11). Dr. McDuffie did not state that contamination or corrosion only occurs when a meter is negligently installed or inspected, or maintained. The only reasonable inference from his testimony is that contamination or corrosion may occur without fault.

■ I find that the origin of the fire was the watthour meter, which was mounted on the panel board in the basement of Morton and that the cause of the fire was an arching event that took place at the connection between the jaws and the blades of the watthour meter. I further find that the arching occurred because of heat build-up due to resistance caused by contamination or corrosion on the blades or jaws or both. Contamination causing a loosening of the connection between the blades and jaws can occur even if the blades are properly seated in the jaws. I further find that there is no evidence that Pepco negligently installed the watthour meter; nor is there any evidence that Pepco failed to properly inspect and maintain the

meter. Although the meter reader did observe a crack in the plastic cover of the watthour meter during a routine reading of the meter on July 27, 1993, about a week prior to the fire, there is no evidence as to what, if anything, he was required to do under those circumstances other than record his observations. There is no evidence concerning what a reasonable and prudent electric power company was required to do under those circumstances, and there is no evidence that the crack in the plastic cap caused or contributed to the contamination or corrosion process.

Dr. McDuffie testified that watthour meters are not hermetically sealed so as to be dust or moisture proof. There was no evidence that the applicable industry standards require hermetically sealed watthour meters. *Rajabi v. Potomac Electric Power Company,* 650 A.2d 1319, 1322 (D.C.1994).

Although the complaint alleged a claim under the doctrine of *res ipsa loquitur,* that theory appears to have been abandoned in the plaintiff's submissions in the joint pretrial statement. Nevertheless, the defendant raised the issue of its applicability in its portion of the joint pretrial statement, therefore, the Court has examined the evidence with that theory in mind.

■ "The principle of *res ipsa loquitur* permits a [finder of fact] to draw an inference of negligence based on special circumstances when direct evidence of negligence is lacking." *Bell v. May Dept. Stores Co.,* 866 F.2d 452, 455 (D.C.Cir.1989) (internal citations omitted). In order to rely on the principle of *res ipsa loquitur,* a plaintiff carries the burden of establishing that: "(1) the event was of the kind that ordinarily does not occur in the absence of someone's negligence; (2) it was caused by an agency or instrumentality within the exclusive control of the defendant; and (3) it was not due to any voluntary action or contribution on the part of the plaintiff." *Barwick v. U.S.,* 923 F.2d 885, 887 (D.C.Cir.1991) (internal citations omitted).

■ The evidence presented by the plaintiff was deficient in at least the first element so as to preclude resort to this principle. Dr. McDuffie testified that the loosen-

ing of the jaw/blade connection, which caused the arching could come about as a consequence of corrosion and that corrosion may result from moisture in the atmosphere (Tr. Jan. 17, 1996, P.M. at 11). In the absence of evidence of industry standards requiring hermetically sealed watthour meters, it can hardly be found that the arching event responsible for the fire "was of the kind that does not occur in the absence of someone's negligence." *Id.* In the words of Dr. McDuffie, "accidents do occur, things do happen." *Id.,* at 10. Moreover, even if applicable, the principle of *res ipsa loquitur* merely permits but does not require a finding of negligence. The Court does not believe that such an inference is warranted under the facts of this case even if it concluded that there was sufficient evidence to support the application of the doctrine.

Hartford also contends that Pepco breached its contract with its insureds by failing to supply electricity in a safe manner. However, the plaintiff has not pointed to any specific *contractual* obligation wherein the power company agreed to furnish electricity in a safe manner. Rather than as a consequence of a contractual duty, it appears that the duty relied on by the plaintiff is one of law which gives rise to a tort claim. *See, Shubitz v. Consolidated Edison Co. of New York,* 59 Misc.2d 732, 301 N.Y.S.2d 926 (N.Y.Sup.Ct.1969). But as we have seen, Hartford has not shown by any evidence, much less by a preponderance of the evidence, that Pepco breached any legal duty owed it.

Neither has Hartford proved any specific contractual duty to install equipment that would allow the safe distribution of electricity. Nor is there any such duty under the common law. "The defendant is not an insurer of the safety of its distribution system, and it is not liable for injuries resulting from its operation unless guilty of some negligent act or omission." *Brown v. Potomac Electric Power Company,* 236 F.Supp. 815, 817 (D.C.D.C.1964).

Nor has Hartford proved that Pepco furnished it defective equipment. The mere happening of an accident does not give rise to an inference that the equipment was defective. It is the plaintiff's burden to prove by a preponderance of the evidence the nature of any defect and the causal relationship of the defect to the loss. *Rajabi,* 650 A.2d at 1321.

Lastly, although Pepco did agree to furnish, install and maintain the watthour meter supplied to Hartford's insureds (Pl's Exh. 17 at p. 9(5)), the plaintiff has failed to prove that Pepco breached this provision or that its breach proximately caused the fire. The burden is on the plaintiff to establish by expert testimony the standard of care for the inspection and maintenance of watthour meters and that a deviation from that standard caused the loss. *Rajabi,* 650 A.2d at 1322. This the plaintiff failed to do. Nor did Pepco's Rules and Regulations—Electrical Service (Pl's Exh. 16) establish any standard of care for the inspection and maintenance of watthour meters, the breach of which would give rise to a cause of action.

### Conclusion

For the reasons set forth, the Court concludes that Hartford Fire Insurance Company failed to prove by a preponderance of the evidence that its loss was caused by the negligence of the Potomac Electric Power Company or due to the breach of any contractual obligations undertaken by the Potomac Electric Power Company.