OF THE

STATE OF IOWA

AT

DES MOINES

SEPTEMBER TERM, 1921, AND
JANUARY TERM, 1922.

---

W. E. EVANS, Administrator, et al., Appellees, v. OSKALOOSA
TRACTION & LIGHT COMPANY, Appellant.

**NEGLIGENCE:** Electric Charge on Abandoned Line. An electric company which, with the knowledge that a mine is being dismantled, causes its abandoned transmission line to said mine to be heavily charged with electric current, for the *sole* purpose of protecting the line from trespassers, without giving notice of such fact to those who, it may fairly anticipate, may be working about the mine, is liable for the proximate results of its said act.

**TRIAL:** Excluding Exhibits From Jury Room. An exhibit which simply bears on the credibility of the testimony of a witness may very properly be excluded from the jury room.

**TRIAL:** Instructions—Correct But Nonexplicit. Correct but nonexplicit instructions are all-sufficient, in the absence of request for greater elaboration.

**APPEAL AND ERROR:** Parties Entitled to Allege Error. A judgment defendant may not predicate error on the rendition of a judgment of subrogation in favor of an intervener, of which plaintiff does not complain.

*Appeal from Mahaska District Court.*—CHARLES A. DEWEY,
Judge.

MARCH 16, 1921.

REHEARING DENIED OCTOBER 1, 1921.

ACTION for damages. The facts are stated in the opinion. Verdict and judgment for plaintiff, and defendant appeals.— *Affirmed.*

*Burrell & Devitt,* for appellant.

*Stipp, Perry, Bannister & Starzinger, Maxwell A. O'Brien,* and *Malcolm & True,* for appellees.

STEVENS, J.—I. Plaintiff is the administrator of the estate of James T. Evans, who was accidentally killed on June 1, 1918, when a piece of pipe which he was handling came in con-

1. NEGLIGENCE: electric charge on abandoned line.

tact with an uninsulated electric transmission wire, carrying 11,000 volts. The defendant owns and operates an electric line and power plant in the city of Oskaloosa, and among its patrons to whom it supplied power for mechanical use was the Bolton-Hoover Coal Company, intervener herein, a corporation owning and operating a coal mine a few miles southwest of said city. The issues and alleged errors presented for review will, we think, be more easily understood if preceded by a somewhat extended statement of the evidence.

Some time in 1914, the defendant, in pursuance of a written contract entered into with intervener in 1914, constructed a high-potential line, either from Beacon or Oskaloosa, to its mine, for the purpose of supplying power for the operation of its mining machinery. Three copper wires, carrying 11,000 volts, were strung on poles 22 feet above the ground, and carried into a small building, referred to in the evidence as the "transformer house," which was located about 35 or 40 feet from a 6-inch drill hole, through which electric wires carrying a current of 250 volts were carried, through several pieces of pipe joined together, into the mine, where they were attached to the machinery therein. This transmission line was constructed and used solely, prior to March 17, 1917, for the purpose of supply-

ing current to intervener. The transformer house was located in a pasture, about ½ or ¾ of a mile from the entrance to the mine.

About the middle of March, 1917, a representative of intervener orally notified the defendant that its coal was exhausted and that the machinery had been removed from the mine, and requested that the current be turned off. This was done on March 17th, by turning switches on top of one of defendant's poles at Beacon. Later, the wires were disconnected from the transformer by one of the employees of defendant. The current, upon order of defendant's superintendent, was again turned on, April 21st. In the afternoon of June 1st, Evans, the deceased, went to the drill hole near the transformer house, with two of the other employees of intervener, with the proper and necessary tools, for the purpose of removing the pipe from the drill hole. The drill hole was about 36 inches to one side of the nearest transmission wire. The pipe was removed from the drill hole by raising it by means of a block and tackle until the joint was elevated above the surface of the ground, when the pipe was unscrewed by the use of tongs, applied to the pipe above and below the joint. After the pipe was loosened, Evans finished the unscrewing of the joint with his hands. While engaged in unscrewing with his hands a piece of pipe extending about 22 feet above the ground, the upper end came in contact with the nearest transmission wire, instantly killing him. Before the wires were detached, when the current was on, a buzzing noise was emitted from the transformer, which could be heard for a distance of 75 feet or more. The two employees of intervener who were assisting Evans to remove the pipe from the drill holes testified that they went to the transformer house, looked in, and heard no sound. The reason assigned by defendant's superintendent for ordering the current turned on, on April 21st, was to prevent the copper wires from being injured or stolen. W. S. Hatchitt, line foreman of defendant, testified that, when he disconnected the transformers, he put a sign on the inside of the transformer house, and also on the door thereof, reading: "Danger—high tension lines." Other witnesses testified to the same effect. The employees of intervener who were assisting Evans to remove the pipe testified that there was no sign or warning about the building, except a metal plate on the door, which

had been there a long time, bearing the word "Danger." Their testimony is corroborated to some extent by that of other witnesses.

J. H. Porter, the superintendent of defendant, testified that the current was turned on on April 21st, after a conference and an agreement to that effect with W. W. Branigar, manager, secretary, and treasurer of the coal company, in the presence of C. W. Pilgrim, one of the employees of defendant, whose testimony corroborated that of Porter. He further testified that this conversation was, in substance, repeated at different times, and that, upon one occasion after April 21st, Branigar complained to him because the transmission line was interfering with the telephone service in the vicinity of the mine. This testimony was all emphatically denied by Branigar, who testified that he had no knowledge that the current was turned on after it was cut off on March 17th. No other evidence was introduced by defendant tending to show that any of the officials or employees of intervener knew that the current was turned on after March 17th.

While other grounds of negligence are stated in the petition, the court, in its charge to the jury, submitted only the following, which we quote from the instruction of the court:

"First. In charging said transmission wires with about 11,000 volts of electricity, when said wires were not in use, and when defendant knew, or by the exercise of ordinary care should have known, that said coal company's employees, in dismantling said mine, would be working in close proximity thereto, so as likely to be injured thereby.

"Second. In turning the electric current on said transmission wires without first notifying the Bolton-Hoover Coal Company or its employees, or said James T. Evans, that the electric current was turned off of said transmission wires."

At the close of the evidence, counsel for defendant moved separately for a directed verdict in its favor, and against both plaintiff and intervener. Shortly after the death of Evans, application was made by the coal company to the district court of Mahaska County for an order commuting all future payments to the dependents of deceased to a lump sum, as provided by Section 2477-m14 of the Supplement to the Code, 1913. An

order was entered, commuting the amount to a lump sum of $2,002.19, which the coal company paid to the widow of deceased. In its petition of intervention, it asks to be subrogated to the rights of plaintiff against the defendant, to the extent of the amount paid Mrs. Evans. Defendant's motion for verdict against the intervener was based upon a provision of the contract entered into in 1914 between defendant and the coal company for the construction of the transmission line to the mine, under which the coal company agreed to indemnify and hold the defendant harmless from any claim that might be made against it by any person on account of the construction, operation, or maintenance of the transmission line, and upon the further ground that the coal company had not accepted the provisions of the Workmen's Compensation Act, and was not entitled to be subrogated to the rights of plaintiff under the provisions of Section 2477-m6 of the Supplement. A verdict was asked in favor of the defendant against the plaintiff, upon the ground that the evidence wholly failed to show that the death of Evans was due to or caused by any negligence on the part of the defendant. The latter motion was overruled, and ruling upon the motion for a directed verdict against the intervener was reserved by the court, until after the verdict of the jury.

The law is well settled in this state that one furnishing electricity, while not an insurer, is held to the highest degree of care consistent with the conduct and operation of the business. *Harter v. Colfax E. L. & P. Co.*, 124 Iowa 500; *Barto v. Iowa Tel. Co.*, 126 Iowa 241; *Knowlton v. Des Moines E. L. Co.*, 117 Iowa 451; *Toney v. Interstate Power Co.*, 180 Iowa 1362. See, also, *Haas v. Washington W. P. Co.*, 93 Wash. 291 (160 Pac. 954).

Negligence is the failure of one party to discharge its duty to another. Can it be said, under the facts disclosed, that the death of Evans was due to the failure of the defendant to perform some duty which it owed to the intervener or to deceased?

It appears from the record that intervener was engaged continuously in the work of dismantling its mine, from the middle of March until after June 1st, when the accident occurred. The record does not disclose much of what was necessary to be done, to accomplish the work of dismantling the mine. The mining

machinery was removed from the mine, prior to March 17th. On the forenoon of June 1st, Evans and his companions were working in the scale pit at the mine. The only evidence showing direct notice to the defendant that the mine was to be abandoned and dismantled, was that of the mine foreman, who testified that, when he notified a representative of defendant to turn off the current permanently, he told him that he had removed the works and machinery from the mine. It was later that some of the employees of defendant disconnected the wire from the transformer in the transformer house. The transformer house was owned and erected by the coal company, as was also the wire extending from the transformer into the mine. The transformer and a meter in the "transformer house," together with the electric machinery in the mine, were installed by defendant. No evidence was received from which the jury could infer that any representative of the defendant had actual notice that Evans and his companions were engaged in removing the pipe from the drill hole at the time of the accident. We assume, in the absence of some evidence to the contrary, that the only practicable method of removing the pipe from the drill hole was that adopted by Evans and his coemployees. The jury was fully warranted in finding that deceased did not know that the current was on. The fact that the buzzing noise had disappeared from the transformer, coupled with the knowledge, which he must have had, that no use could be made of the current at the place where the accident occurred, was sufficient to justify the belief on his part, which he expressed to Kent, that the current was off, and that contact with the wires would not be dangerous. No evidence was introduced on behalf of defendant for the purpose of showing that its officers and employees did not know that the mine was being dismantled on and after April 21st, when the current was, as must have been found by the jury, voluntarily and deliberately turned on by defendant, without notice to the deceased or to the coal company. Wires running from the transformer through the pipe into the mine were attached to the machinery by the servants and employees of the defendant, who must have known the manner in which such wires were carried from the surface to the machinery below. No negligence was shown upon the part of the defendant in the construction of the high-tension line. The

wires were securely attached to the poles, or to attachments pro-
vided for that purpose, at least 22 feet above the surface of the
ground.    As stated, the current was turned on on April .21st,
solely for the purpose of preventing the wires from being in-
jured or stolen, and no current was being supplied to or used by
any of the patrons of defendant.    Deceased had no reason to
suspect that the wires were charged with electricity.    It is true
that direct notice to the defendant of the intended removal of
the pipe from the drill hole is not shown.    Nevertheless, as al-
ready stated, the agents and employees of defendant must rea-
sonably have known that the pipe was in the drill hole, and that
it could be removed.    The evidence does not show the condition
of the pipe, nor its value; but it was used in connection with
the mine, and defendant knew that the mine was being dis-
mantled, and may well have anticipated that the removal of
the pipe would probably follow, as a part of the process of dis-
mantling.    Had the transmission line been used for furnishing
current to others of the patrons of the defendant, it is scarcely
probable that intervener's employees would have undertaken
to remove the pipe without notice to defendant, and request that
the current be turned off.    The wires have since been taken
down, and the poles removed.

It seems to us that one who sets in motion such a dangerous
and deadly agency as a current of electricity carrying 11,000
volts, for the sole purpose of protecting it from trespassers, and
under the facts shown in the record before us, cannot escape
liability for damages because its agents did not have actual no-
tice that a person lawfully employed, as Evans was, might, in
the performance of his duty, come in contact therewith, and be
injured or killed.    The knowledge that the mine was to be
abandoned, that machinery had been removed therefrom, and
that the process of dismantling had started, and that the elec-
tric current was no longer desired for the operation of the min-
ing machinery, imposed upon the defendant the duty of ascer-
taining whether the work of dismantling had been completed,
and that workmen employed by the coal company for that pur-
pose might come into contact with the wires, and the duty of
notifying the officers of said company, or its servants, that the
current had been or would be again turned on.    It is significant

that the transmission line was not, at the time, being used for the purpose of supplying current to defendant's patrons, and this fact cannot be ignored, in considering the question of defendant's negligence.

But it is further urged by counsel for appellant that the employees of intervener would have been trespassers upon the land where the drill hole was located, if they had not first obtained permission to go thereon, from the person in possession or control thereof. The testimony upon this point is that Evans went to the house of J. E. Kent, a tenant in possession of the land, and jokingly inquired if they might go down in the pasture and take the pipes out of the drill hole. The only answer made by Kent was that they would better look out for the electricity. As stated, the drill hole was only 35 or 40 feet from the transformer house, which was built and owned by the coal company. Evans was not, at the time of the accident, a trespasser, but was engaged in a duty which was made hazardous only by the act of the defendant in turning on the current without notice to the coal company, for the protection of those who, it should have anticipated, might be employed in doing the very work which he was doing at the time of the accident. The evidence presented a question of fact for the jury; and we cannot say, as a matter of law, that the defendant was not negligent in turning on the current without notice to the coal company. The motion to direct a verdict for the defendant against the plaintiff was properly overruled.

II. James T. Evans worked as a company man, and W. E. Evans, plaintiff herein, testified that company men for the past two years had received $5.00 per day. The petition filed by him in the proceedings in the district court against the Bolton-Hoover Coal Company alleged that deceased, at the time of his death, was receiving $2.98 per day. These allegations of the petition were called to the attention of the witness upon cross-examination, and the instrument was offered in evidence. The court, however, refused to permit the exhibit to be taken to the jury room, when the jury retired for deliberation. Complaint is made of this ruling.

2. TRIAL: excluding exhibits from jury room.

The petition contained numerous other allegations, and the testimony of Evans was brief, and could not have been misunder-

stood or overlooked by the jury. Notwithstanding the provisions of Section 3717 of the Code, which provides that all papers received in evidence, except depositions, may be taken by the jury, upon retiring for deliberation, we have held that we will not reverse because of the refusal of the court to permit this to be done, unless it was prejudicial to the complaining party. *Hraha v. Maple Blk. Coal Co.,* 154 Iowa 710; *McMahon v. Iowa Ice Co.,* 137 Iowa 368. We cannot conceive how the defendant could have been prejudiced by the refusal of the court to permit the jury to take the petition with it, upon retiring for deliberation.

III. As previously stated, J. H. Porter and two of the employees of defendant, including W. S. Hatchitt, testified to an alleged conversation between Porter and Branigar, on April 20th, the day before the current was turned on. It is claimed by these witnesses that Branigar, in this conversation, assented to the suggestion of Porter that the current be turned on for the protection of the wires, in which the coal company had some interest, under the contract for the construction of the line. All employees of defendant working on its transmission lines kept daily time slips, on which is entered the place where they were engaged, together with the number of hours they were employed during the day. Time slips signed by Hatchitt, dated March 17, two dated April 21, and one dated May 15, 1917, were offered by the defendant, but were excluded, upon the objection of counsel for plaintiff. The slip dated March 17th bore the following: "Names—Open switch Bolton Line;" one of those of April 21st: "Names—Disconnecting transformers at Bolton and throwing in switch Beacon;" and the other one dated April 21st: "Names—Bolton Line;" and that of May 15th: "Names— Bolton line trouble."

It is the claim of counsel for appellant that these slips tended to corroborate the testimony of the witnesses to the alleged conversation between Porter and Branigar, and that, under our holdings in *Edwards v. City of Cedar Rapids,* 138 Iowa 421, *Graham v. Dillon,* 144 Iowa 82, *Worez v. Des Moines City R. Co.,* 175 Iowa 1, and *Hanson v. City of Anamosa,* 177 Iowa 101, they were admissible as memoranda made by disinterested witnesses at the time of the transaction, and in the line of their duty.

There is no controversy as to what was done on March 17th and on April 21st. On the former date, the current was turned off; and on the later date, it was turned on again. The excluded exhibits bearing these dates were, therefore, without value to the defendant. Porter further testified that Branigar was at his office on May 15th, and informed him that the Bolton transmission line was interfering with the telephone lines in that vicinity. At most, the slip bearing this date showed that there was trouble on the Bolton line, the nature of which is not shown; and the only possible sense in which it could be considered as corroborative of the testimony of Porter as to the alleged conversation on May 15th is that it is so dated, and refers to trouble on the Bolton line. Even if its admissibility were conceded, it is difficult to see how defendant could have been materially prejudiced by its exclusion. It could have been given but slight, if any, weight by the jury.

IV. Exceptions are urged to the fifth, sixth, eighth, and thirteenth paragraphs of the court's charge to the jury. These instructions submitted the case to the jury upon the theory suggested by the grounds of negligence quoted above 3. TRIAL: instructions: correct but nonexplicit. from the court's charge to the jury. The instructions are substantially correct. Counsel, however, argues that they are incomplete, and that the court erroneously failed to instruct the jury that, if the current was turned on with the knowledge and acquiescence of Branigar, then it was his duty to notify the employees of the coal company, and that, if he failed to do so, plaintiff could not recover damages from the defendant. The instructions correctly stated the law, so far as they went; but it is true that they did not as fully include the element of notice to the coal company, as shown by the testimony of defendant's witnesses, as would have been proper. If counsel desired further instructions upon this point, however, request should have been made therefor.

V. After the verdict of the jury was returned, the court overruled plaintiff's motion, filed at the close of the evidence, assailing the petition in intervention, and ordered judgment to be entered, subrogating intervener to the rights of plaintiff to the extent of $2,002.19, with interest thereon at 6 per cent from July 14, 1917, the date on which this sum was paid to the

widow of deceased, under the order obtained from the court. The defendant alone appeals. The ruling was clearly without prejudice to the defendant. The judgment against it was not thereby increased to any extent. It can make no difference to the defendant whether the amount recovered is all paid to the plaintiff, or part of it to the intervener.

The only exception urged to this ruling of the court by defendant upon this appeal is the exception based upon the provisions of the contract for the construction of the transmission line, agreeing to indemnify the defendant against loss or damages resulting from the use of the line. The question does not require consideration or decision. Some complaint is also made by counsel for plaintiff of the order for subrogation; but, as plaintiff did not appeal therefrom, the court cannot review the point raised by plaintiff. Since we find no reversible error in the record, the judgment of the court below is, in all respects,—*Affirmed.*

4. APPEAL AND ERROR: parties entitled to allege error.

Evans, C. J., Arthur and Faville, JJ., concur.