EDWARD M. DILLEY, Administrator, Appellant, v. IOWA PUBLIC SERVICE COMPANY, Appellee.

No. 39946.

OCTOBER 22, 1929.

REHEARING DENIED OCTOBER 23, 1930.

*Charles R. Metcalfe,* for appellant.

*Price & Burnquist* and *Guy T. Struble,* for appellee.

EVANS, J.—I.   The defendant is a public utility corporation, which owns and operates an electric system, and includes in its service the town of Kingsley.  The decedent was a boy nine years and three months of age, who was flying a kite in the streets of Kingsley.  His "string" was a fine copper wire, which came in contact with the transmission line of the defendant.  The voltage of the transmission line was 33,000.  The contact resulted in the death of the boy.  The flying of the kite was in violation of a city ordinance forbidding the flying of kites within the city.  The plaintiff predicated his action upon the "specific negligence" alleged in his petition.  This was:   (1) That the defendant was maintaining a transmission line of high voltage (33,000) on the streets of Kingsley without any authority therefor;  (2) that it maintained said line without proper insulation or guard against injury therefrom.  All the evidence was directed to these propositions.

It is undisputed that the defendant holds a franchise under

Ordinance 44 of the city of Kingsley, to operate an electric power plant for the purpose of supplying the town of Kingsley and its inhabitants with electric energy, the same to be generated inside or outside the town, as the company may elect. The right to use the streets for such purpose is granted. The point made by plaintiff is that such ordinance did not in express terms confer a right upon the defendant to maintain a transmission line of high voltage over its streets. It appears that the necessary voltage for distribution in the town of Kingsley is 2,300 units. The electric energy furnished by the defendant is generated outside of the town and at a considerable distance therefrom. The transmission line is not for the sole use of Kingsley. It carries the electric energy for other towns, as well as for Kingsley. The ordinance does not in express terms either permit or forbid the construction of transmission lines over the streets of the city. It does contain provisions, however, which clearly imply permission to that end. For instance, under Section 2 it is provided that the electric energy may be generated "outside said town," in which event the "grantee shall erect and maintain a sub-station within said town." In Section 3 it is provided:

"If the electric energy is generated outside of the town, then all *transmission wires* used shall not be smaller than No. 6 solid copper wire."

Section 4 provides:

"All poles supporting wires carrying current voltage *in excess of 2,300 volts* shall not be less than seven-inch tops, and 35 feet long. The construction shall be standard, substantial, and of first-class material. Grantee shall, however, have the right to trim trees along the streets and alleys, in order to provide and maintain a safe installation *of high-voltage wires.*"

Section 5 provides:

"Whenever any poles, wires, or other construction of the *transmission lines* or distribution system *hereby authorized* shall be in such a position as to interfere with the moving of any building," etc.

It is not claimed that the authority of the corporation to

maintain these transmission lines has ever been challenged by the public authorities. We deem it apparent that the construction and maintenance of the transmission lines were within the contemplation of the ordinance, and that such has been the construction mutually put upon it by the city and by the grantee. The claim of the plaintiff that the occupancy of the street for the maintenance of the transmission lines was without authority is, therefore, not tenable.

II. The second point urged by the plaintiff is that the transmission lines were not properly insulated or guarded. To this question the testimony of experts was directed. These wires  were not covered with any so-called insulating material. It appears from the undisputed testimony of the experts on both sides that there is no material known which can be made efficient as an insulating covering for wires carrying high voltage. In the early history of the art, various devices were used, and successively abandoned. The only practicable means of insulating known to the experts is atmospheric space. Transmission lines are, therefore, carried at a great height. The ordinance under consideration required poles to be 35 feet high. The height actually adopted by the utility company was 40 feet. Isolation of the wire is the objective. A guard wire was extended 29 inches above the transmission line, and this was grounded at the poles. The special purpose of this guard wire was to counteract the effect of lightning.

The only semblance of dispute in the record is at this point. The plaintiff called as witnesses two experts, who described a scheme of insulation or guard which was in vogue to some extent prior to 1916. This was known as the "basket" or "cage" system. It consisted in extending beneath the transmission line three wires, 18 inches apart, and held in place by wooden stays. The principal purpose of this scheme was to prevent the falling of a broken transmission line. That is, it was intended to maintain isolation of the line in the emergency of a break. The contention of the plaintiff is that, if that system had been in use by the defendant, it would probably have prevented the contact of the kite string with the transmission line. It was not claimed by the experts for the plaintiff that this system was in vogue at the present time at any place. By the experts for the defendant it

was stated that the system was not in use anywhere, and had not been since the year 1916. It further appears that, in or about the year 1916, a certain set of rules known as the Safety Code came into vogue. It was formulated through the co-operation of many experts, representing electric companies, telephone companies, and telegraph companies. This Safety Code met the universal approval and adoption of the great body of enterprise engaged in electrical activities. It was adopted by the Bureau of Standards of Washington, D.C., and is universally recognized as standard. This is undisputed. Under the statutes of this state, the railroad commission is empowered to make regulations for the construction of transmission lines within its jurisdiction. It has adopted the Safety Code above referred to as standard. True, its jurisdiction does not extend to cities. The legislature has indirectly recognized such standard by its amendment of Section 1527-c of the 1913 Supplement. By Section 1527-c it was required in the construction of transmission lines that the grantee "shall use only strong and proper wires, *properly insulated.*" In *Graves v. Interstate Power Co.*, 189 Iowa 227, we held that insulation was mandatory under this statute, whether practicable or not. Thereafter, the legislature eliminated from the statute the words "properly insulated." The corresponding provision of the statute now is:

"Such lines shall be built of strong and proper wires attached to strong and sufficient supports *properly insulated at all points of attachment.*" Section 8326, Code, 1924.

In the case before us, the wires were, without dispute, insulated at the points of attachment. Without dispute, too, the line in question conformed in its construction to all the specifications set forth in Section 8326, Code, 1924. Whether we look to the statute, therefore, or to the Safety Code, as a practical standard of construction, the transmission line under consideration was in full conformity with each of them.

It should be noted at this point, however, that the above Section 8326 purports to apply only to transmission lines erected outside of cities and towns. See Section 8309. No different standard, however, is provided for cities and towns. If we assume a legislative purpose to permit the cities and towns to prescribe the method of construction, yet no different standard

was prescribed by the ordinances of Kingsley. Section 8326 does recognize the standard adopted by the Safety Code. In the absence of other regulation, therefore, we know no safer guide than to give it judicial recognition.

This is not saying that either the statute or the Safety Code has in any degree slackened the requirement of vigilance upon the electrical company. On the contrary, it is held to a high degree of vigilance. Isolation being the only practical means of safety, it is held to a high degree of vigilance to maintain that isolation. If its diligence fails in such respect, it becomes responsible. Our own recent cases are quite illustrative of the degree and kind of vigilance exacted from the utility company.

In *Lipovac v. Iowa R. & L. Co.*, 202 Iowa 517, a pole was broken, whereby the wire was brought close to the ground. While it was in that position, a boy came in contact therewith, and lost his life.

In *Walters v. Iowa Elec. Co.*, 203 Iowa 471, the defendant-company failed to maintain isolation, in that it permitted a wire to sag, and to come in contact with a tree, resulting in a fire.

In *Beman v. Iowa Elec. Co.*, 205 Iowa 730, the utility company failed to maintain its isolation in that it placed its wires too close to the "boom" of a bridge gang.

In each of these cases, the defendant was held liable as for negligence.

In the case before us, there was no failure on the part of the company to maintain isolation of its wire. The kite went up 40 or 50 feet, and necessarily invaded the isolation provided for the wire. The flying of the kite was an intentional and independent act, and indeed was unlawful. The accident resulted, not from any failure on the part of the defendant to meet all the statutory requirements of construction, but because the copper wire was carried up to it. Unless the company was already negligent in its manner of construction and maintenance, it did not become negligent by the mere act of another. The fact, if such, that such act was to some degree irresponsible, because of the tender years of the child, could have no influence upon the quality of the defendant's conduct. In such a case, the wrongful act of the injured party is to be deemed the proximate cause of his injury. An exception to this rule arises when a case of "attrac-

tive nuisance'' is presented, as in *McKiddy v. Des Moines Elec. Co.,* 202 Iowa 225.

We are of opinion, therefore, that the undisputed evidence disclosed a full compliance with the requirements of the law in the construction and maintenance of the transmission line.

III. The appellant predicates a right of reversal upon Section 8323 of the Code, 1924. Such section is in part as follows:

''In case of injury to any person or property by any such transmission line, negligence will be presumed on the part of the person or corporation operating said line in causing said injury, but this presumption may be rebutted by proof.''

The point made is that the plaintiff had no need of specific allegation of negligence or specific proof thereof, and that the burden was upon the defendant to rebut the statutory presump-tion. The appellant raises the point for the first time in this court. He did not raise it before the trial court. The case is not triable here *de novo,* but upon errors only. There can be no error upon a question not submitted to the trial court for its consideration. Whether the result would have been different if the point had been raised, we need not speculate. The plaintiff tried his case in the district court upon his own theory, and the court passed upon the questions raised by him. He cannot open up new ground in the submission of his appeal here. See, however, *Anderson v. Fort Dodge, D. M. & S. R. Co.,* 208 Iowa 369.

Upon the case presented, the district court ruled properly, and its judgment is—*Affirmed.*

Albert, C. J., and Faville, De Graff, and Kindig, JJ., concur.