IDA MAE CRONK, administratrix of estate of Cyril Cronk, deceased, appellee, v. IOWA POWER AND LIGHT COMPANY, appellant.

No. 51567.

(Reported in 138 N.W.2d 843)

604

DECEMBER 14, 1965.

REHEARING DENIED FEBRUARY 8, 1966.

Duncan, Jones, Riley & Davis and Robert G. Riley, all of Des Moines, for appellant.

Brunk, Janss, Dreher, Adams & Wilson, Robert E. Dreher and Harold Van Voorhis, all of Des Moines, for appellee.

MASON, J.—This is a negligence action by the estate of a deceased Des Moines waterworks employee claiming damages by reason of his untimely death.

Trial was to the court without a jury. The court found defendant negligent under the circumstances, decedent free from negligence, defendant's negligence was the proximate cause of decedent's death and damages. Defendant's appeal from adverse

judgment challenges these findings. It contends the court erred in finding: 1) defendant was negligent in failing to insulate its wires at the place of the accident, 2) defendant's alleged negligence was a proximate cause of decedent's death and 3) decedent was free from contributory negligence.

The evidence will be viewed in the light most favorable to plaintiff—this is also the light most favorable to the trial court's judgment. Its findings of fact have the effect of a special verdict and are binding upon us if supported by substantial evidence. Citation of authority is unnecessary. Rule 344(f)1, Rules of Civil Procedure. Our question is whether the trial court's findings are supported by substantial evidence, and we will not weigh the evidence or the credibility of the witness. Phoenix v. Stevens, 256 Iowa 432, 127 N.W.2d 640; Iowa Mutual Insurance Co. v. Combes, 257 Iowa 135, 131 N.W.2d 751; Thompson Wholesale Co. v. Frink, 257 Iowa 193, 131 N.W.2d 779. That we might reach a different result were we sitting as trier of the facts is of no consequence.

On September 12, 1957, the decedent Cyril Cronk lost his life by electrocution while in the performance of his duties as a foreman of a group of men engaged in digging a ditch for the laying of a water main along the south side of Park Avenue in the city of Des Moines. Defendant's electric transmission lines, consisting of two sets of three wires each, were also located on the south side of Park Avenue and ran in an east and west direction at the point material. Construction work had originated the last of June or first part of July 1957 on the north side of Park Avenue at the intersection of Thomas Beck Road and ran west to a point east of the Great Western tracks; the ditch was then taken across Park Avenue to the south to avoid defendant's high-pressure gas line which ran down the north side of Valley Drive on west on the north side of Park Avenue to the Meredith plant. The main-laying project continued west under the tracks to the west edge of a bridge spanning a small creek located a short distance west of the intersection of Valley Drive and Park Avenue. A ditch was being dug beneath the creek bed. The ditching had been done with a backhoe except at the railroad crossing and creek; in these two places a backhoe would not do

the job and a mobile crane mounted on a rubber-tired truck, capable of rotating a full 360 degrees with a projecting arm or boom 30 feet in length supporting a 2800-pound bucket, was used; cables ran from the bucket to the boom. This machine is sometimes referred to as a clamshell bucket. Before noon on September 12 the crane had been used in excavating earth from the east bank of the creek with the projecting arm facing east. In order to permit the west bank of the creek to be excavated and earth moved eastward and dumped in the trench where the pipe had already been laid, it was necessary to turn the machine around to a position in which the arm or boom faced west. Decedent was engaged in getting the truck and crane in proper position to continue the excavation work and was giving signals by hand to a Mr. Beveridge, operator of the truck, and a Mr. Sparks, operator of the crane. In moving the boom a tooth of the bucket came to rest on the west edge of the bridge bannister. Attempting to free the bucket, decedent gave it a push and was electrocuted.

There were no power lines on the north side of the road; it was not until the water company crew crossed the road east of the railroad track and started down the south side of Park Avenue with the new main construction that they were working alongside the power line. The three lower wires forming a part of defendant's transmission line in the area over the bridge were not insulated other than by air and space. There was no insulation on the wires themselves.

At the close of plaintiff's evidence defendant rested; its only evidence was from cross-examination of witnesses for plaintiff and certain exhibits.

The foregoing facts which are not controverted give a sufficient background of the accident for our purposes at this point.

Defendant was aware the water company was engaged in the project of laying a 20-inch main in the vicinity of the accident before the water company crew reached the bridge. This occurred almost two and one-half months after the project started. Marion B. Cunningham, an employee for some forty years of defendant-company and superintendent of gas operations for the division including Des Moines, called by plaintiff, testified he was

aware the water company was laying a 20-inch main down to the Meredith plant west of the bridge. The gas company had received a couple of calls about broken service in the six-inch low-pressure line east of the railroad on the south side of Park Avenue; the service would be going north and south of the main to houses on the north side. The water crew's digging disturbed the lines, producing a leak. Defendant's repair crew made records of these repair calls which form a part of the company's records.

It was the custom and practice between defendant-company and the water company to stay on opposite sides of the highway when laying their respective lines.

A. R. Adams, a graduate electrical engineer with 25 years experience who was in charge of defendant's electrical operation in Des Moines at the time of decedent's death, testified he was next man under the vice-president of operations of defendant-company, it was common in Des Moines for clamshell buckets and backhoe machines to be used in the proximity of overhead conductors such as are shown in the various pictures received as exhibits in this case and that during the period involved herein and for several years prior, there had been a considerable amount of sewer construction and water main construction around the area of Des Moines.

Defendant knew the water company would cross over east of the railroad track so as not to interfere with defendant's high-pressure gas line on the north side and that the water company crew would be working in the area of defendant's bare power wires with backhoe machines and clamshell buckets.

The foregoing would justify the following findings made by the court.

"It was reasonably to be anticipated and the defendant either knew or should have known that men would likely be working in the streets with modern machinery, such as was used in this instance, for the purpose of excavating or digging ditches or trenches for the laying of water mains. The decedent was lawfully in the use of Park Avenue in his work at the time of his death."

Adams testified that although defendant's high-tension line

was insulated by air and space at the point involved in conformity with the standards of the National Electrical Safety Code, with bare wires carrying 13,800 volts, electricity will jump or arc from one-half inch to an inch and if a grounded object, such as the boom of the rubber-tired crane in this instance, came within such distance electricity will arc over to the object without actual contact. Once the arc is established the grounded object can be removed several inches and under certain conditions as far as one to three feet, and electricity will continue to flow through it to the ground.

He also testified there was an insulation material which could be provided on those wires which, assuming it worked in all cases, could prevent such a contact or prevent completion of the circuit and thus prevent the arcing or jumping over of the electricity.

Sparks testified that as Cronk gave the bucket a shove it swung away from him and he saw arcs of electricity come from decedent's hands. Sparks then looked up at the boom. It was not in contact with the wires. He testified he could not accurately say how far the boom was from the wires as he was 30 feet from the end, but at that distance he would guess five or six inches. There was no bounce to the boom when the tooth of the bucket hung up on the corner of the bridge. The bucket was empty and the cable was carrying the weight. After Cronk dropped, Sparks held the bucket in position until they removed him. Upon later inspection no fresh scars or marks were found on the crane or boom.

Emmett Rogers testified that from his position he could see the decedent put his hand on the bucket, the witness glanced up toward the boom, there was a spark up towards the boom and when he looked back, decedent was rolling over and his feet hung over the bank of the creek. He further testified the boom was pretty close to the wires, but it did not look like it made contact and his best judgment was that the boom did not touch the wire.

Defendant's transmission lines were located in the street south of the traveled portion thereof; decedent was lawfully in this right-of-way installing the water main.

This evidence would warrant a finding that "under favor-

able physical, weather and atmospheric conditions current will arc or jump from a line transmitting electricity to an object in close proximity to it but which is not in actual contact with it. In such a case the object becomes energized and anyone coming in contact with it will, if grounded, receive an electric shock. The court finds that this is what happened on September 12, 1957, when the decedent lost his life. The projecting arm or boom of the crane, although not in actual contact with the wire, became energized as a result of the arcing or jumping of the current and when the decedent pushed the bucket the electricity passed through his body."

The court further found that "* * * in the exercise of ordinary care the defendant could not ignore the right of Des Moines Water Works and the employees or servants to lay water mains in the streets * * * in proximity to the defendant's transmission lines. An ordinarily careful and prudent person engaged in the business of producing and transmitting electricity would, *under the circumstances existing in this case,* have protected its wires or cables in the area where the accident in this case occurred with an insulating material which would have prevented electricity from arcing or jumping from them. This was not done and because of such failure the decedent lost his life." (Emphasis supplied.)

The court then concluded "* * * under the circumstances * * * an ordinarily careful and prudent person would have protected his transmission lines or cables at the place where the accident occurred by insulating them with such material as would have prevented current from escaping by means of arcing or jumping and that the defendant * * * failed so to do. Such failure constitutes negligence."

Exhibit 10 indicates the lower set of defendant's transmission lines were elevated 20 feet 9 inches.

Plaintiff alleged six specifications of negligence in paragraph seven, stating: "That the defendant was negligent in the construction, maintenance and operation of the said power transmission line *in the said location* in the following particulars:" (Emphasis supplied.) The question of insulation was raised in subparagraphs (b) " in not properly grounding and protecting

the said overhead wires" and (f) "in failing to construct, maintain and operate said transmission line in conformity with accepted standards of care and prudence observed in the industry, and required by law." The court determined the other grounds of negligence asserted could not be sustained.

Specifications for materials to be used for insulating wires carrying heavy electrical current had not been approved by the city council of Des Moines prior to September 12, 1957, as required by section 18-58 of the Municipal Code.

Aside from any provision in the city ordinance it was the duty of defendant to use reasonable care to prevent the escape of electricity from its lines in such way as to cause injury to persons who might lawfully be in the area of danger incident to the escape of electricity from such lines. Knowlton v. Des Moines Edison Light Co., 117 Iowa 451, 455, 90 N.W. 818, 819.

It is the duty of a person or corporation that maintains and controls wires or cables for the furnishing of electricity to others to carefully and properly insulate their wires at all places where there is a likelihood or reasonable probability of human contact by persons whose business or duty, or rightful pursuit of mere diversion or pleasure, brings them without contributory fault on their part into the zone of danger. However, in the absence of statute or municipal ordinance, this duty does not compel the company to insulate or adopt safeguards for their wires everywhere but only at places where people may legitimately go for work, business or pleasure—that is, where they may reasonably be expected to come in proximity to them. Knowlton v. Des Moines Edison Light Co., 117 Iowa 451, 455, 90 N.W. 818; Toney v. Interstate Power Co., 180 Iowa 1362, 1368, 163 N.W. 394; Graves v. Interstate Power Co., 189 Iowa 227, 232, 178 N.W. 376; 29 C. J. S., Electricity, section 44, page 1086; 18 Am. Jur., Electricity, section 97, pages 491, 492; Curtis on Law of Electricity, section 510.

The law is well settled in this state that one furnishing electricity, while not an insurer, is held to the highest degree of care consistent with the conduct and operation of the business. The defendant had the duty to use reasonable care commensurate

with the danger to prevent the escape of electricity from its lines. Walters v. Iowa Electric Co., 203 Iowa 471, 474, 212 N.W. 884; Evans v. Oskaloosa Traction and Light Co., 192 Iowa 1, 5, 181 N.W. 782.

I. Appellant asserts in support of its first assignment of error as a brief point, "The duty of a utility company to insulate its wires is not absolute nor does it extend to all parts of the system; being limited to places where people in the exercise of ordinary care may be reasonably expected to go for work, business or pleasure," and in written argument states, "* * * the proposition we urge—against *total* insulation, but requiring it where people might be reasonably expected to go in their business, work, as incidental pursuits * * *."

This is all the trial court found. In its tenth finding and first conclusion the words, "under the circumstances existing in this case" are used. Plaintiff in paragraph seven alleged "in the said location."

Adams testified on cross-examination he was familiar with exhibit 11, the National Electrical Safety Code, and shortly after the tragedy occurred studied the installation in question, comparing it with the applicable provisions of the code, and found no violation in defendant's construction.

■ Compliance with the safety code is a relevant fact on the question of due care. Proof of compliance with the standards furnished by the National Electrical Safety Code was not conclusive on trier of the fact on question of defendant's due care. Actionable negligence may exist even though the utility involved has complied with the requirements of the safety code. It is not conclusive on the question of due care by the utility. Whether a utility is negligent despite compliance with safety code is ordinarily a question for the jury or trier of fact. Mississippi Power & Light Co. v. Walters, 248 Miss. 206, 158 So.2d 2, 160 So.2d 908; 29 C. J. S., Electricity, section 68, page 1167.

■ We have stated what we believe to be defendant's duty. The trier of fact found, under the circumstances existing in this case in the area in question, defendant had not exercised ordinary care in performance of that duty; therefore, defendant was negligent.

From the facts detailed herein, such findings were justified.

 II. Negligence to be actionable must be a proximate cause of the injury. Proximate cause is any cause which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the result complained of and without which the result would not have occurred. It is a primary moving cause or predominating cause from which the injury flows as a natural, direct and immediate consequence and without which it would not have occurred. It is not necessary to a defendant's liability that the consequences of his negligence should have been foreseen, and it is sufficient if the injuries are the natural, though not necessary or inevitable, result of the wrong. Chenoweth v. Flynn, 251 Iowa 11, 16, 99 N.W.2d 310, 313; Christianson v. Kramer, 255 Iowa 239, 249, 122 N.W.2d 283, 289, and citations.

Defendant contends Sparks was negligent in the operation of the clamshell bucket and such negligence was an intervening cause which relieved defendant of responsibility, asserting as a basis for this argument that Sparks knew a bare wire carried overhead current at the bridge, and from the time Cronk started signaling until he fell, Sparks was not looking up or observing the boom as he continually kept Cronk under observation until decedent rolled over on his side. Sparks had so testified. However, he also testified that in an effort to keep out of the wires he made a test before starting work by setting the bucket down and measuring the boom for clearance.

 An intervening force is one which actively operates in producing harm to another after the actor's negligent act or omission has been committed. It primarily refers to some act or agency for which a defendant is not responsible. Webber v. E. K. Larimer Hardware Co., 234 Iowa 1381, 1386, 15 N.W.2d 286, 289; Restatement, Second, Torts, section 441; See Comment and Illustrations under section 442B.

Generally questions of negligence, contributory negligence and proximate cause are for the jury; it is only in exceptional cases that they may be decided as a matter of law. Citation of authority unnecessary. Rule 344(f)10, Rules of Civil Procedure.

 The court found the condition which caused Cronk's

death would not have been brought about but for defendant's failure to insulate its wires and cables. This was proximate cause. There are facts which would support such a finding.

III. Appellant's final assignment attacks the court's finding deceased was free from contributory negligence.

Rogers' testimony concerning a conversation with decedent shortly before his death warrants the court's finding decedent knew the wires and cables were carrying 13,000 volts. When the construction project reached the railroad crossing, Cronk and Rogers had gone to the creek to make measurements; when asked about a pole on either bank Cronk told Rogers it was like a switch that could cut the line going to the cement plant, it carried 13,000 volts and they did not "want to tangle up in that." The court found: "It does not appear from the record that the decedent was experienced in working with electricity or that he possessed knowledge concerning the likelihood or conditions under which current will arc or jump."

 Contributory negligence on the part of the decedent is not established merely by showing that he worked in a place of known danger, but it also must be shown that his conduct was negligent in the face of the danger. In other words, the basic test is whether the decedent as a reasonably prudent man was in the exercise of ordinary care in doing his work under the circumstances. Restatement, Second, Torts, section 473. This is a fact question.

The judgment of the trial court in awarding plaintiff the sum of $18,586.99 for death of the 49-year-old decedent with a life expectancy of 24.45 years, with interest at the rate of five percent per annum from date of death and the costs of this action, must be affirmed.—Affirmed.

GARFIELD, C. J., and LARSON, THORNTON, MOORE, RAWLINGS and BECKER, JJ., concur.

STUART and SNELL, JJ., dissent.

STUART, J.—I must dissent. I do not quarrel with the statement of the law set forth in the majority opinion that in the absence of statute or ordinance defendant has no duty "to insulate or adopt safeguards for their wires everywhere but only at places where people may legitimately go for work, business

or pleasure—that is, where they may reasonably be expected to come in proximity to them." I cannot, however, agree with the conclusion that the defendant could have reasonably anticipated persons were likely to come in contact with these wires at this location.

The line met or exceeded the requirements of the National Electrical Safety Code. No ordinances establishing specifications for insulation have been enacted by the City of Des Moines. The superintendent of defendant's gas operations knew the water department was laying a water main to the Meredith plant west of the bridge shown in exhibit B. The superintendent of the electrical operation did not testify as to any knowledge of this particular construction work. He testified only that it was common for clamshell buckets and backhoes to be used close to overhead conductors and that there had been a considerable amount of sewer and water main construction around the area of Des Moines. There was no evidence of any request to move the wires or turn off the electricity or of any contact with defendant by plaintiff or anyone else connected with this construction operation.

Even if we assume defendant had sufficient knowledge of this particular construction work, I am unable to see what bearing this could have on the charge of failing to insulate its wires. Insulation by isolation is an accepted practice in the electrical utility field. This is recognized in the safety code and the heighth of the wires here exceeded the minimum requirement. There was nothing about this location which would cause defendant to anticipate compliance with the safety code would not be sufficient. Knowledge of construction work could not make the original installation negligent if it was not negligently installed. "Unless the company was already negligent in its manner of construction and maintenance, it did not become negligent by the mere act of another." Dilley v. Iowa Public Service Co., 210 Iowa 1332, 1337, 227 N.W. 173. Knowledge might have had a bearing on the duty to warn, shut off the current or temporarily move the line, but not, in my opinion, on the failure to insulate in the first place.

The trial court carefully limited its decision to the circumstances of this case and this fact was emphasized by the majority

opinion. However, neither points out the circumstances which set this particular location apart from any other in which a

transmission line runs along a highway. The picture included herewith, exhibit B in the trial, shows the location at which the

majority holds the trier of fact could find defendant should have reasonably anticipated someone might come into contact with its electric lines.

I have studied all the Iowa cases and the annotations in 14 A. L. R. 1018, 1023, 56 A. L. R. 1011, 1021, and 69 A. L. R.2d 93. There is a clear trend toward enlarging the liability of electrical utilities, but none seems to have gone so far as we are going under these facts. Defendant asserts this decision, in effect, will require insulation of all its transmission lines and I am inclined to agree, at least those within the Des Moines city limits.

We are, in effect, permitting the fact finder to impose strict liability on the defendant under instructions which impose liability only for fault. This is not fair to the litigants or the trier of facts and leads to greatly divergent results under similar factual situations. A jury which conscientiously applies the instructions and searches for fault or proximate cause will in all likelihood return a defendant's verdict. Another jury might look at the social aspects of the lawsuit and impose liability on defendant as a risk of engaging in this particular business.

While I do not believe this is a case for the imposition of strict liability, there is no question but what "the dangers arising from the production, transmission, storage and use of electricity are among the greatest and most subtle known to mankind." Toney v. Interstate Power Co., 180 Iowa 1362, 1370, 163 N.W. 394. If we are going to let the fact finder impose strict liability, we should do it under appropriate instructions and bring about greater uniformity in the results and so advise the bench and the bar.

Under the facts here, I would reverse.

JUSTICE SNELL joins in this dissent.