Mary Jane NELSON, Administratrix of the Estate of Raymond Nelson, Deceased, Appellant,

v.

IOWA–ILLINOIS GAS AND ELECTRIC COMPANY, Appellee.

No. 52993.

Supreme Court of Iowa.

July 18, 1968.

---

Ulstad & Guinan, Fort Dodge, for appellant.

Johnson, Burnquist, McCormick & Erb, Fort Dodge, for appellee.

MOORE, Justice.

This is a negligence action by administratrix of the estate of deceased spouse for death by electrocution on December 1, 1961. Different facets of the same factual circumstances have twice been before this court. See Nelson v. Iowa-Illinois Gas & Elec. Co., 259 Iowa 101, 143 N.W.2d 289, which involved plaintiff's claim for damages against Cities Service Oil Co. and Nelson v. Cities Service Oil Co., 259 Iowa 1209, 146 N.W.2d 261, which involved a claim for workmen's compensation. In

each, plaintiff was unsuccessful. Here we are concerned with her action against Iowa-Illinois Gas and Electric Company for alleged negligent maintenance of its electric transmission line. At the close of all evidence the trial court directed a verdict for defendant. Plaintiff has appealed from judgment thereon. We affirm.

Plaintiff asserts the trial court erred in holding the evidence insufficient for submission of pleaded specifications of negligence and refusing to submit the case under the rebuttable presumption provided by what is now section 489.16, Code, 1966.

■ I. In considering the propriety of a motion for directed verdict we view the evidence in the light most favorable to the party against whom the motion is made. Rule 344(f)2, Rules of Civil Procedure.

Plaintiff's decedent, Raymond Nelson, was hired by Cities Service Oil Company to remove three underground gasoline storage tanks at the site of an abandoned service station about six miles north of Fort Dodge. The station had ceased business operations approximately six months prior to December 1, 1961 the date on which decedent, accompanied by Harvey Finney, a crane operator, went to the site to remove the tanks. The crane mounted on a large truck had been taken to the station site the night before.

The station was on the east side of highway 413, which there runs in a north-south direction. Parallel to 413 and along the east edge thereof, defendant maintained a 13,800 volt power line consisting of three wires. The poles and line had originally been installed in 1929 with permission of the county engineer who apparently had authority to direct location of the poles. Between 1929 and 1952 the line was single phase carrying 7200 volts.

In 1952 the line was reconstructed, pursuant to approval secured from the Iowa Commerce Commission, to accommodate 13,800 volts. The original poles, located about one foot west of the boundary be-

tween the highway and service station property, were left in position but new wires and ten foot crossarms were installed. Two of the three wires were attached to the west half of the crossarms. The third was attached to the outer edge of the east half. The uninsulated wires were more than thirty six inches apart. The east wire extended approximately five feet beyond the right-of-way and over the service station property.

On December 1 decedent and Finney went to the site and began preparations to remove the tanks. They had worked together previously on other jobs. Both men were aware of the wires and discussed the importance of using care in the vicinity thereof. Defendant had no notice or knowledge of the tank removal project. Finney placed the cab of the crane directly under the wires with the boom hung over the area where the tanks lay. He operated the crane while decedent worked on the ground attaching a chain to the tanks for lifting them and removing the chain after each tank was taken out. They were placed on the ground to the southwest of the holes from which they were removed. In order to place them in that position the crane swung toward the wires.

As decedent was removing the chain from the third and last tank which had just been lifted out of its hole, a lethal current of electricity passed through his body resulting in his death.

Finney testified: "I had taken last tank out and I kept tanks in a straight line parallel with building so as to stay away from wires, and I left crane boom in same position it was when I dropped the tank and left a little slack. I set the house lock brake so boom would not move. Raymond removed chain from tank and he was trying to remove chain from bucket when electricity hit. When house was locked a man could only move boom's upper end at most six inches, if that. I was sitting in my seat in cab when I saw Raymond stiffen and I looked up and saw end of boom was three or four feet away from all wires. I saw no arcing or electrical jumping from wires when I looked up, but I saw smoke around the bucket and Raymond had been killed instantly.

"At the time Raymond Nelson was removing the chain from the bucket and at the time the crane made contact with the electricity I was looking at him. I saw him stiffen, but didn't hear or see any arcing between the wires and boom. His hands were working on the chain."

Immediately after the accident defendant company was notified and its employees investigated the facts. Plaintiff called as one of her witnesses, Mr. Warren Ewen, defendant's electrical distribution superintendent, who had inspected the line and boom on the day of the accident. He testified damage to the line was negligible but a bright copper spot was visible on the surface of the east wire and a corresponding spot was found on a stay cable on the boom approximately two feet from the top. These spots mark the point of contact between the electric current and the boom. Whether the boom touched the wire or the electricity arced could not be determined. The point of contact on the transmission wire was above the gravel driveway into the service station.

Mr. Ewen, a graduate electrical engineer from the University of Iowa and an experienced designer of electrical transmission lines, testified in detail regarding the transmission line here involved, the requirements of the National Electrical Safety Code and proper designing of transmission lines. Plaintiff introduced in evidence a copy of the safety code which Ewen stated was prepared under the supervision of the Department of Commerce, "in which qualified people try to determine some standards in which everyone can live with; standards of safety for the public; standards of safety for the customers; standards of safety for the workmen who have to work on the lines; also standards of safety for their continued operation for the good of the customers. All these things are involved. Several organizations have

members on the committee that draws the standards and revises them periodically. As new materials and new methods are available, standards are upgraded and updated." He further testified the Iowa Commerce Commission, to which defendant company is responsible, had adopted said safety code as the standards for proper electrical practice in Iowa.

Mr. Ewen related the many requirements of the safety code, including those where electrical lines are over or near private property, and stated the minimum requirement had not only been met but exceeded at the place of the accident. He outlined how the minimum height and clearance requirements were exceeded by several feet. Ewen stated having in mind the National Electrical Safety Code and the term "good engineering practice" he found no defect or deficiency in the installation.

Plaintiff's witness, Glenn H. Miller, a civil engineer and former highway commission employee, identified a plat, exhibit 2, prepared by him showing the oil station site, the measurements and the location of various items. He expressed the opinion the location of the poles was improper because of the overhang of the east wire over private property. The record is entirely devoid of any proof of whether defendant company had obtained permission to so locate the wire or held an easement. He had no training or experience as an electrical engineer and had never studied the requirements of the National Electrical Safety Code.

Keith Peterson, the holder of a Bachelor's degree in engineering from the University of Iowa, was called as a witness by plaintiff. He had acted as a field engineer in New York and had designed a one volt transmission line for a community antenna system transmission line. He was unfamiliar with the provisions of the safety code although he had read some of its provisions a week before testifying. He attempted to construe some of its provisions regarding clearance requirements but on cross-examination stated he could have been mistaken. His testimony includes:

"Q. Are you aware that they (rules of the National Electrical Safety Code) have been adopted by the Iowa Commerce Commission as the standards to be followed as safety rules for the installation and maintenance of electrical supply and communication lines in the State of Iowa by Utilities? A. No.

"Q. You weren't aware of that? A. No, I wasn't aware of it.

"Q. Is it any longer your testimony that this book limits the distance between the western edge of that slab and that line to eight feet? A. I am not basing my opinion on that book.

"Q. Is it any longer your opinion that this book requires at least an eight foot clearance between a point under the line and the western edge of that concrete slab? A. I would have to go into further study to state.

"Q. Then is it correct to say this, at least for the present you are withdrawing that opinion? A. That opinion on this book, yes. My opinion will not be based on this book."

As we understand the record Mr. Peterson opined the location of the poles and wire was not proper engineering because of the location of the east wire over private property. He stated he believed there were other high power transmission lines in the same county over private property and he knew nothing of the circumstances of the installation of the line here involved or whether the utility company had an easement.

Willis Hogan, a graduate electrical engineer and employee of defendant company for 45 years, described the 1929 installation and the 1952 reconstruction of the transmission line. He stated the installations complied with the established rules and regulations in force at the time the work was done. The service station was not built until about 1948.

Mr. F. W. Newberry, a 1942 graduate of the State University of Iowa with a Bachelor of Science degree in Electrical Engineering and a design engineer with Stanley Consultants of Muscatine, at defendant's instance studied the installation at and near the service station site. He held membership in national and state electrical engineer groups and was a registered professional engineer in Iowa, Illinois and Massachusetts.

After testifying in great detail regarding location and measurements of the various items at the site of the accident he stated:

"Q. Based then upon your observations, your training and your experience, do you have an opinion, Mr. Newberry, as to whether or not the line that was contacted, this is the wire that was contacted on December 1, 1961, was situated in conformity with the requirements of the National Electrical Safety Code and with all standards of good engineering practice? A. I would say that the line was designed in conformity with all the provisions of the National Electrical Safety Code and as far as vertical clearances are concerned and spacing of conductors and clearances from adjacent buildings, and the clearances over the roadway, I would say that this is in conformance with the Code and that it exceeds the Code requirements.

"Q. Does it also meet the term 'good engineering standards and practices'? A. Yes, sir."

Both parties rely heavily on our recent case of Cronk v. Iowa Power and Light Co., 258 Iowa 603, 138 N.W.2d 843, which is factually similar with the facts here in many respects. These principles of law supported by many cited authorities are recognized in Cronk and are not challenged by the parties. (1) Compliance with the safety code is a relevant fact on the question of due care. Proof of compliance with the standards furnished by the National Electrical Safety Code is not conclusive on trier of the fact on question of defendant's due care. Actionable negligence may exist even though the utility involved has complied with the requirements of the safety code. (2) It was the duty of defendant to use reasonable care to prevent the escape of electricity from its lines in such way as to cause injury to persons who might lawfully be in the area of danger incident to escape of electricity from such lines. (3) One furnishing electricity, while not an insurer, is held to the highest degree of care consistent with the conduct and operation of the business. (4) It is the duty of a person or corporation that maintains and controls wires for the furnishing of electricity to others to carefully insulate their wires at all places where there is a likelihood or reasonable probability of human contact by persons whose business or duty, or rightful pursuit of mere diversion or pleasure, brings them without contributory fault on their part into the zone of danger. However, in the absence of statute or municipal ordinance, this duty does not compel the company to insulate or adopt safeguards for their wires everywhere but only at places where people may legitimately go for work, business or pleasure—that is, where they may reasonably be expected to come in proximity to them. Pages 611, 612 of 258 Iowa, pages 847, 848 of 138 N.W.2d.

With reference to the National Electrical Safety Code we have said: "While this code has in so far as this case is concerned, no legislative sanction, it is difficult to conceive a better test of care than compliance with its provisions." Smith v. Iowa Public Service Co., 233 Iowa 336, 337, 6 N.W.2d 123.

In Cronk, decedent, a water works employee, was working on the ground helping free a crane bucket when the boom came in contact with a high voltage transmission line and he was electrocuted. We affirmed the trial court's finding of liability strictly on the utility company's failure to warn of the danger or insulate the wire after it was fully aware the work was going to be done near the line and the company had time to give a warning or in-

sulate the wire. Such are not the facts here. Defendant's transmission line had remained unchanged since 1952. Decedent and Finney were fully aware of the danger before starting work with the crane. Defendant company did not have the slightest notice or knowledge the crane was to be used near its line. It learned of the project only after decedent was electrocuted. These facts clearly distinguish this case from Cronk and compel a contrary holding as a matter of law.

Plaintiff's petition alleges numerous specifications of negligence. Many are repetitious. Our careful study of the record reveals plaintiff not only failed to introduce evidence on which any of them could be submitted as fact issues to the jury but they are affirmatively disproved.

■ II. In regard to transmission lines outside of cities and towns what is now section 489.16, Code, 1966 provides in part: "In case of injury to any person or property by any such transmission line, negligence will be presumed on the part of the person or corporation operating said line in causing said injury, but this presumption may be rebutted by proof."

Plaintiff urges the weight of this presumption alone is enough to require submission to the jury. In the usual and ordinary negligence case we would tend to agree, at least in the absence of sufficient rebuttal. In this particular instance, however, the force of the evidence negating the presumption is of such magnitude, so clear, convincing and conclusive that the presumption is rebutted as a matter of law.

The question of when a rebuttable presumption is overcome as a matter of law has been before this court on previous occasions. In Schaefer v. Anchor Mut. Fire Insurance Co., 133 Iowa 205, 209, 100 N. W. 857, 858, we say: "It cannot be said, in view of the affirmative evidence, that the naked presumption raised any conflict which should have been submitted to the jury." See also Kauffman v. Logan, 187 Iowa 670, 174 N.W. 366.

"We may assume the record in a given case may be such the statutory presumption is conclusively—as a matter of law—rebutted." Casey v. Hansen, 238 Iowa 62, 69, 26 N.W.2d 50, 55.

In considering the same statutory section, now section 489.16, Code, 1966, in Isaacs v. Eastern Iowa L. & P. Co-op., 236 Iowa 402, 407, 19 N.W.2d 208, 210, we say: "To overcome the presumption the evidence must be clear and convincing. See Kauffman v. Logan, supra. If the presumption of negligence is not so overcome the presumption must stand. It follows as a matter of course that the presumption created by statute could not be said to have been overcome unless the evidence of appellant rebutted the presumption of negligence at all points so that the court could say as a matter of law that appellee's testimony had been completely rebutted." It is so rebutted here.

In view of our holding herein we do not consider or decide defendant's contention section 489.16 is unconstitutional.

The judgment of the trial court is

Affirmed.

GARFIELD, C. J., and SNELL, STUART, MASON and LeGRAND, JJ., concur.

RAWLINGS, LARSON and BECKER, JJ., dissent.

RAWLINGS, Justice (dissenting).

I respectfully dissent.

In my humble opinion the evidence, when viewed in a light most favorable to plaintiff, serves to create a jury issue. As we said in Cronk v. Iowa Power & Light Co., 258 Iowa 603, 612, 138 N.W.2d 843: "Whether a utility is negligent despite compliance with safety code is ordinarily a question for the jury or trier of fact." See also rule 344(f) (10), R.C.P.

I would reverse and remand.

LARSON and BECKER, JJ., join in this dissent.